O'DOWD v. LINEHAN

OPINION OF THE COURT

1. EVIDENCE — ADMISSIBILITY — WITNESSES — EXPERT WITNESSES —
RULES.

Rules governing the admissibility of testimony of expert wit-
nesses are:  (1) there must be an expert, (2) there must be
facts in evidence which require or are subject to examination
and analysis by a competent expert, and (3) there must be
knowledge in a particular area that belongs more to an expert
than to the common man which depends upon the relation of
expert knowledge to common knowledge at a given time.

2. EVIDENCE — ADMISSIBILITY — WITNESSES — EXPERT WITNESSES —
INERTIA — AUTOMOBILES.

Admission of testimony of traffic-accident reconstruction expert
explaining the laws of inertia and the effect on each auto-
mobile was proper in an automobile accident case and would
be likely to be beneficial to the jury in its assessment of
the evidence since this information is not ordinarily within
the knowledge of the common man.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 31 Am Jur 2d, Expert and Opinion Evidence § 16 *et seq.*
[2, 4, 7, 8] 8 Am Jur 2d, Automobiles and Highway Traffic § 981.
[3, 5, 9] 8 Am Jur 2d, Automobiles and Highway Traffic § 989.
Admissibility of opinion evidence as to point of impact or col-
lision in motor vehicle accident case.  66 ALR2d 1048.
[6] 8 Am Jur 2d, Automobiles and Highway Traffic § 991.

3. Evidence — Admissibility — Witnesses — Expert Witnesses — Automobiles — Speed — Point of Impact.

Admission as evidence of the opinion of a traffic-accident reconstruction expert as to the relative speed of two automobiles, in attempting to fix a point of impact, and his explanation of why the location of tire marks, dirt and debris in the northbound traffic lane was not inconsistent with his expressed belief that the point of impact was in the southbound traffic lane was vital in the defense of the case and challenged the credibility of another witness, had the further purpose of furnishing a basis to support the expert's opinion, and did not constitute prejudicial error.

4. Evidence — Witnesses — Expert Witnesses — Automobiles — Assumptions — Conclusions.

Testimony of traffic-accident reconstruction expert, who had prepared a drawing of an accident scene, and testified that gouge marks shown in his drawing were located on the basis of photographs admitted in evidence that, in his opinion, the gouge marks were caused by the buckled frame members of one of the automobiles involved, was not expert testimony but an assumption or conclusion and, if proper objection had been made, it should have been excluded.

5. Evidence — Witnesses — Expert Witnesses — Automobiles — Remoteness.

Traffic-accident reconstruction expert's testimony of the damaged condition of an automobile, in attempting to prove the angle of collision between two automobiles, received without an adequate foundation having been first laid to give it probative value, should have been excluded under proper objection as his observations of the damage, made four months following the accident, were too remote.

6. Evidence—Witnesses—Expert Witnesses—Automobiles.

Preliminary factual foundation was wholly inadequate to permit traffic-accident reconstruction expert to express an expert opinion as to how an automobile accident occurred where his opinion was based on speculation from the evidence of physical damage to one automobile.

7. Evidence — Witnesses — Expert Witnesses — Automobiles — Cause of Accident — Jury Question.

Opinion testimony of traffic-accident reconstruction expert as to how an automobile accident occurred, based on his own investigation, and his undertaking to fix the blame for the accident was error where there was nothing so exceptional

in the record of the case as to require an expert opinion
on the ultimate issue for the jury.

8. EVIDENCE — ADMISSIBILITY — WITNESSES — EXPERT WITNESSES —
AUTOMOBILES — COMMON KNOWLEDGE — EVALUATION OF OTHER
TESTIMONY.

Testimony of traffic-accident reconstruction expert that, at a
speed of 60 miles an hour a vehicle would travel 88 feet
a second and that, if another vehicle was approaching at the
same speed, the closing time of the two automobiles would
have been 16/100th of a second and as to the normal re-
action time of a 25-year-old man in braking a car, was not
error, since the information obtained through the testimony
cannot be classed as common knowledge and presumably it
would be helpful to the jury in its evaluation of another
witness' testimony.

CONCURRING OPINION

WILLIAMS, J.

9. AUTOMOBILES — WITNESSES — EXPERT WITNESSES — OPINION
TESTIMONY — ACCIDENTS — ACCIDENT RECONSTRUCTION — POINT
OF IMPACT — COURSE OF AUTOMOBILES.

*Case should be remanded for determination with particular
attention to establishing a satisfactory state of the art of
accident reconstruction as to the course of automobiles prior
to an accident based on angles of impact and the qualification
of a witness in the exact area in which it is desired he testify
before allowing either an expert witness or a police officer to
testify as to their opinions on the point of impact of auto-
mobiles and more especially the course of vehicles prior to
impact.*

Appeal from Court of Appeals, Division 2, Mc-
Gregor, P. J., and Quinn and Letts, JJ., affirming
Jackson, John C. Dalton, J.   Submitted November
9, 1970.   (No. 10 October Term 1970, Docket No.
52,402.)   Resubmitted April 8, 1971.   (No. 13 April
Term 1971.)   Decided August 27, 1971.

14 Mich App 260 reversed.

Declaration by Dennis O'Dowd, administrator of
the estate of Delores O'Dowd, deceased, against Paul

G. Linehan, administrator of the estate of Dana W. Linehan, deceased, for the wrongful death of plaintiff's decedent as a result of an automobile collision. Verdict and judgment for defendant. Plaintiff appealed to the Court of Appeals. Affirmed. Plaintiff appeals. Reversed and remanded for new trial.

*Kelly, Kelly & Kelly,* for plaintiff.

*Domke, Marcoux, Allen & Beaman,* for defendant.

ADAMS, J.

# I

## FACTS AND PROCEEDINGS

Saturday night, May 26, 1962, John Gutekunst, age 25, had a date with Carol McClintic. She owned a Ford Galaxie convertible in which they drove to the Eagle's Nest Tavern located on the south side of Clark Lake in Jackson County, arriving at approximately 10:30. They drank some beer. Around 12:30, Robert Emmons entered the tavern. John Gutekunst had known him since high school days. Emmons was accompanied by plaintiff's decedent, Mrs. O'Dowd. The time was spent with conversation, beer and games. Upon the closing of the tavern, the two couples left intending to drive to town to get something to eat at a restaurant. John and Carol were in the Ford, followed by Emmons and Mrs. O'Dowd in a Pontiac. They traveled side roads from the lake until reaching US–127 where they headed north toward Jackson.

Gutekunst testified that US–127 is slightly down hill as you approach Loomis Road. He was driving at approximately 60 miles per hour, followed closely by the Emmons car. Just past the intersection with Loomis Road, he observed the headlights of a car,

coming from the north, turning directly toward
him. He swerved his car to the right, the right
front wheel going off the highway onto the shoulder.
His testimony continues:

"*Q.* Then what happened?
"*A.* Then I was hit in the rear.
"*Q.* What section of the car?
"*A.* It started scraping me about the left-hand
door, tore a hole just behind the door, and halfway
back in the fender got the full force of it.
"*Q.* What happened after this impact?
"*A.* We went into a spin.
"*Q.* Where did you finally come to rest?
"*A.* Down the road, against the fence.
"*Q.* Was this the same side of the highway that
you were proceeding on? In other words, the right-
hand side?
"*A.* No, it was across the highway.
"*Q.* In other words, your car had gone across the
other side of the highway, up against the fence?
"*A.* Yes.
"*Q.* Of your own knowledge, do you know how
far from the point of impact your car traveled?
"*A.* I don't. I wouldn't venture to say."

It was admitted by defendant that the southbound
automobile was a Cadillac being driven by Dana W.
Linehan. It collided with the Emmons Pontiac.
Gutekunst testified he did not see the impact. After
ascertaining that they were unhurt, John and Carol
walked back to the scene of the accident. He de-
scribed the Cadillac as being in the middle of the
road. A small fire was burning beneath it. The
Emmons car was located on the east shoulder of the
road. State Police arrived almost immediately and
told them to go back to their own car and sit there.
Gutekunst continued testifying:

"*Q.* Was your car able to be moved?
"*A.* No.

"*Q.* Why couldn't it be moved?

"*A.* The left rear fender was into the wheel.

"*Q.* Did you subsequently drive the car away?

"*A.* After the fender was pulled away, yes. * * *

"The rear of the car was up against the corner post [of the fence]."

At the time of the trial, Carol was married to John Gutekunst. She gave this additional detail:

"*Q.* Who pulled the left rear fender of your car away from the tire?

"*A.* The wrecker."

Richard Brantner, a trooper in the State Police assigned to the Jackson Post, working a 6 p.m. to 2 a.m. shift at the time, came upon the scene of the accident about 2:50 a.m. Sunday while northbound on·US–127. Because he saw a person was caught inside, his first act was to put out a fire that was burning in the Cadillac. He observed a Pontiac car on its top and nosed into a bank. There were no occupants inside. A male body lay on the ground on the north side of the overturned car and another victim was found in the grass after a search. A third vehicle was farther up and on the west side of the road. After the injured had been removed by ambulance, the trooper made some observations of the physical conditions.

It was stipulated by counsel that the highway was 22 feet wide. Trooper Brantner fixed the width of the shoulders at 10 feet, plus a few inches. He said that in a vehicle collision case it was his practice to determine the point of impact from the dirt and debris that is dislodged from the underside of the vehicles when they come together. He testified that from the location of dirt and debris and other articles on the highway, he concluded there were two points of impact and that both occurred in the

northbound lane. The motor from the Pontiac was on the highway in the center of the northbound lane. Except for the motor and the debris, the highway was clear.

Brantner made some measurements at the scene with a steel tape. The Cadillac was off the highway to the west with the front bumper "pointing a little bit north but mostly west." He measured the distance as 22 feet from the rear bumper of the Cadillac to the closest point of impact. The distance between this point of impact and the Pontiac was 89 feet, 4 inches. The Ford was pointing partially north but mostly east with its back bumper tangled in the fence. Brantner gave his opinion that the Cadillac struck the Ford and called that collision the first point of impact. He paced the distance from that point to the Ford and fixed it at approximately 150 yards.

Brantner testified there were black skid marks on the pavement made by the Linehan Cadillac after it left the point of impact with the Ford; that the marks started east of the center line and came a little south and to the west. He found no marks left by the Cadillac north of the scene. From the point of impact with the Ford, there were gouge marks in the gravel on the right shoulder going north, followed by black marks diagonally across the highway with more gouge marks in the gravel on the left shoulder and through the grass, ending at the Ford. His written report contained no record as to any paint on either the Ford or the Cadillac from the other car. He had Stewart's Wrecker Service of Jackson come out and remove the Cadillac and the Pontiac to Jackson.

Defendant produced Elmer Pitman who testified that he was a farmer living on the property where the fence was damaged by the Ford car. He talked

with the occupants and walked to the scene of the accident. His testimony did not contradict that of the plaintiff's witnesses in any material respect.

Defendant's next witness was William E. Billings of Cleveland Heights, Ohio, who qualified himself as an expert in traffic-accident reconstruction, a phase of traffic engineering. His investigation of the accident began on September 22, 1962, when he inspected the Cadillac and Pontiac cars after they had been moved to the Doss Auto Parts on Ann Arbor Road just east of Jackson. The witness continued:

"[A]lso on that same day—I conducted an investigation at the scene of the accident, including highway measurements, observation, and measurements of gouge marks, and also noted and determined the locations of the Cadillac and Pontiac with the assistance of police photographs and also oil spots that were still visible on the ground in confirmation of the locations of the vehicles as shown in the photographs.

"On Saturday, January 22, 1963, I made a further inspection of the Cadillac and Pontiac.

"On Saturday, February 23, 1963, I did make measurements of like cars; that is, like the Cadillac and the Pontiac and the Ford, in Cleveland.

"Also, in my study I had the benefit of photographs taken at the scene of the accident of all three vehicles after their removal from the scene and the testimony as presented in this case the last three days."

Objection was made to the witness expressing his opinion as to how the accident occurred, at which time counsel for plaintiff, as a part of his objection, commented:

"I respectfully request the Court to rule that Mr. Billings cannot testify as to his opinion at this time, because he has stated he came into this matter on September 22, examined photographs—I believe the

photographs in evidence were taken September 22, which was almost four months after this accident happened. He examined the cars out at Doss Auto Parts, and I personally know that these cars at one time were on a lot on Elizabeth Street and Perrine, I believe, where they were originally moved. They have been moved twice."

The objection was denied and the witness answered:

"*A*. My opinion is that: The Emmons Pontiac was proceeding north on United States Route 127 following the Gutekunst Ford. In the vicinity of Loomis Road, United States 127 is a concrete pavement and twenty-two feet wide.

"The Emmons Pontiac started to overtake and pass the Gutekunst Ford and in—as the Linehan Cadillac was approaching, southbound. The driver of Emmons' Pontiac realized that he had insufficient passing clearance and tried to drop back behind the Ford. He was unsuccessful in doing so, with the result that the right side of the front bumper of the Pontiac came into contact with the left side of the rear bumper of the Ford, and immediately after that initial impact the second impact occurred with the Emmons Pontiac running head-on into the southbound Linehan vehicle, with the front left halves of the vehicles, that is, the Cadillac and the Pontiac, being in contact.

"As the result of the first impact, at impact between the bumpers of the Pontiac and the Ford, the rear of the Ford was kicked around to the right or to the east, starting in a counterclockwise direction. The driver of the Gutekunst Ford tried to correct that by turning in the direction of the slide, which explains the tire mark along the east shoulder. However, he was unable to overcome this bump to the right, with the result that the Gutekunst Ford continued in a northwesterly direction across the pavement, across the western-westerly shoulder, ran

into a fence on the west side of the pavement and came to a stop against the fence in an easterly direction approximately 650 feet north of this initial impact and about forty feet west of the driveway.

\* \* \*

"The Cadillac was southbound and the Pontiac northbound.

\* \* \*

"[W]hen this collision occurred the forces of collision were equal and opposite at the point of impact. In other words, the tendency is to push each car back at point of impact.

"Now, with this impact each car, of course, is decelerated, and due to the inertia of each car, which is its desire to continue in the same direction and same speed it was before the accident, this desire to continue forward or its inertia may be considered as a force going in the direction the cars were going before the impact. And this force, of course, in the Pontiac naturally pushes the Pontiac northerly, and the reverse force is at the point of impact. So we get for the Pontiac a counterclockwise spin, and similarly for the Cadillac. So when the two cars came together each car turned counterclockwise, and the Cadillac first of all turned actually in the direction from which it came, northerly, and then another eighth of a turn, coming to a stop in and facing in a northwesterly direction with all four wheels on the west shoulder; and the Pontiac similarly went into a counterclockwise spin across the pavement in a northeasterly direction. How many times it rotated and how many times it rolled over, it is impossible to determine, but the Pontiac came to a stop on its top, generally speaking, in an easterly direction ninety-five feet approximately ninety-five feet from the point of impact in a northwesterly direction. Rather, northeasterly direction, about twenty feet from the pavement edge. And the Cadillac came to

a stop off on the west shoulder about fifteen feet from the pavement edge.

\* \* \*

"*A*. Especially indicative of my opinion as to how the accident happened is the Ford rear bumper damaged on the left side.

"Referring to defendant's exhibit 3 [photograph] of the rear left corner of the Ford and defendant's exhibit 4 [photograph] of the rear left corner of the Ford \* \* \* you will note that the bumper is pushed both in and forward into the corner of the Ford. Now, that substantiates the Pontiac coming up beside the Ford and coming into the Ford. Now, had the Cadillac come into the Ford, sideswiping it, I would expect the bumper to be pushed out and back. \* \* \*

"Secondly, in reference to the bumper, referring to defendant's exhibit 4, this photograph was taken in a direction from the rear left wheel to the front right wheel of the Ford. Looking at the dent, you will note that the dent seems to be or is an approximate direction of the camera—at least in the direction of the camera—was bent even more into the Ford, because it is impossible to follow all of the dent as you look at the bumper from this position off the rear left wheel of the Ford. And that is the angle that the Pontiac took when it came into the Ford.

"Now, had the Cadillac sideswiped the Ford and caught the bumper, the angle of the bumper would be in the opposite direction than it is in this particular picture.

"I would also like to call your attention to the Ford rear fender damage and the left quarter panel, referring again to the defendant's exhibit 3 and also defendant's exhibit 1. \* \* \* Had the Cadillac started its impact with the Ford, as alleged by Gutekunst, just behind the rear door, since the Ford was going off at an angle to the northeast, according to Gutekunst, and the Cadillac was coming into

the Ford, the damage to the Ford would be progressively more and more severe as damage progressed from the position behind the left door of the Ford rearward. Yet we see after this damage to the quarter panel behind the door merely back to the major vertical dent in the fender, merely the trim as having been taken off. And it is my feeling and my opinion that this damage to the quarter panel and also the section of the molding that was taken off was as the result of the Ford coming up against the fence.

"I would now like to call your attention to the vertical indentation in the fender of the Ford behind the rear left wheel. Again visible in defendant's exhibit 1 and defendant's exhibit 3.

"Now you can see, first of all, that the indentation is vertical and deeper at the bottom of the indentation than at the top. This indicates to me that the Ford in its side slide caught the post, the fence post that we know is already knocked down, and that is what knocked down the post.

"You will recall, too, that Mrs. Gutekunst stated that the tire wasn't damaged and that before the car was moved the fender had to be pulled off from the tire, which tells me that this damage from the post occurred very late in the movement of the Ford, because had it occurred at impact the fender obviously would have damaged the tire since it was up against that tire.

"It is therefore my conclusion that this vertical dent was made by the post that was knocked down, and we would expect greater damage at the bottom of the fender than at the top as the post bends over when the rear of the Ford swings into it.

"At impact between the Cadillac and Pontiac, it is my opinion in my reconstruction of the accident that the two cars were in substantially parallel paths coming at each other pretty much in line but offset with their front left halves as they came together;

and in substantiation of that I would like to refer you to the following photograph of the Cadillac.

\* \* \*

"Referring to defendant's exhibit 14 of the Cadillac, you will notice the impact along the side of the Cadillac extends from the front back into the rear left fender.

"Similarly for the Pontiac, referring to defendant's exhibit 8, you will note there complete left-side damage; and, while the picture doesn't show it, from my examination of the vehicle I can state from examination of the vehicle that the rear left fender of the Pontiac was collapsed.

"Now, had that Cadillac been coming in at an angle into the Pontiac, in some such position as this, the Pontiac northbound, the Cadillac angling into the Pontiac, it would have been impossible for the Pontiac to get, with this front half impact, to get around and reach as far back into the left side of the Cadillac as it did. Because, with the Cadillac angling into the Pontiac, you can see that the left side is protected from the impact and the rotations would be this way, as I pointed out previously, counterclockwise, and as the result, as I say, the Pontiac wouldn't be able to get into the—as far back on the left side of the Cadillac.

"In further support of my opinion that the paths were substantially parallel, I would like to refer you to this left bumper section of the Cadillac.

"Now, actually, in this section we have the parking lights here, the left parking lights of the Cadillac, and directly below the left parking lights \* \* \* can be seen in reverse order, of course, the license number from the Pontiac, which is 7464; and I will try and trace that for you. Here is the 7 right here in reverse. We are going this way, of course. Here is the 7. Here is the 4. Here is the—here is the 6 in reverse, and here, also, you can spot the number 4 in this position right here.

"Now, that told me, too, that the cars were substantially in parallel paths when they came together, because of the four numbers were [*sic*] imprinted; and, if they came in at an angle, you wouldn't have had all four numbers.

"And, also, the position of the center front license plate on the Pontiac in respect to the bumper gave me the relative positions, of course, of the two cars, the fronts of the two cars, when they did come together.

\* \* \*

"Now pertinent to the location of the impact of the Cadillac and the Pontiac, as well as the location of the gouge marks, is the relative speeds of the two vehicles immediately before collision.

"The Pontiac had the far greater momentum in view of the fact that it continued some ninety-five feet from impact to its final resting place, while the Cadillac moved only fifteen feet.

"Now, *momentum* is the gross weight of the automobile times its speed. That determines the speeds of the vehicles immediately after impact.

"Now, the Pontiac had four to five hundred pounds less weight, so that in its speed it had to make up for that difference in weight for even the same momentum of the Cadillac; and the Pontiac —and then it had to have even greater speed to negate the speed of the Cadillac and then have enough left over to carry it some ninety-five feet to its final position.

"Now, this is important in my analysis, in that that tells me when the two cars came together there was less deflection of the Pontiac than there was of the Cadillac. \* \* \* The Pontiac path was changed less than that of the Cadillac.

"And I have in my hands defendant's exhibit 17 of the Cadillac, the front view, and you will note there that the front right wheel or right axle, which appears to be the brake drum, is in the middle of

the automobile, and showing how the left side of the Cadillac was twisted around. In fact, the entire front was twisted around to the left.

\* \* \*

"Now, when the two cars came together in the position again as I am showing them, the far greater momentum and speed of the Pontiac pulled the front of the Cadillac to the right or to the east, across the center line, into the northbound lane, in the direction such as I am showing it.

"In other words, the vehicles come together here in the southbound lane, and the Pontiac bends and swings somewhat counterclockwise, but in view of its greater momentum and speed it swung the front of the Cadillac around into the northbound lane. And then after that the Cadillac continued, as I indicated earlier, counterclockwise, a half full turn to the north and then to the northwest.

"This explains to me why we had tire marks as testified by Trooper Brantner, tire marks from the Cadillac in the northbound lane, as the car was carried over, and then it rotated back to its final position.

"Also, we find dirt and debris in the northbound lane.

"Now, after collision, we all know that gouge marks follow only because you have to have collision. Following collision, you have bending of parts and then the parts in turn gouge the pavement.

"Also, while dirt and debris is a better indicator than the heavy metal parts because the metal parts scatter more, nonetheless, dirt and debris is carried by the motion of the vehicle.

"Obviously, before the accident, the dirt and debris were going at the same speed as the cars, and after impact the dirt and debris is still carried by the motions of the vehicles; and I want to repeat to you the fact that the Pontiac was going at a much greater speed than the Cadillac, carrying the Cadil-

lac in a rotation over into the northbound lane and carrying the debris with it.

"Now, exactly, if you drop an object two feet off the ground at thirty miles an hour, it will hit the ground about fifteen feet away from the point where it was dropped in the direction, of course, that it was moving. And it is mv opinion that the dirt and debris was released at breakaway of the two cars, as after rotation of the Pontiac continued into the northeasterly direction and the Cadillac rotated around counterclockwise to its final position.

"Just as a final point in support of my reconstruction, had the Cadillac been proceeding east of south and struck the Pontiac in the left side, I would expect the Cadillac after impact to be on the highway and not off on the west shoulder for this reason.

"A basic law of physics is the conservation of momentum, momentum being the gross weight of the vehicle times its speed.

"In accordance with this basic law, these two cars before impact had the same momentum they had after impact. Momentum is direction as well as quantity.

"Now, in this situation, the Pontiac northbound and the Cadillac southeast-bound, you will notice before impact we have momentum to the east and south. We have momentum of the Pontiac first to the north. There is no westerly momentum here to carry this Cadillac off to the west. And we are feeding easterly momentum into the two cars at impact. And for that reason I would expect the Cadillac to come to a stop on the pavement rather than off on the west shoulder immediately after collision."

On cross-examination, the witness expressed additional opinions and gave other testimony:

"*Q.* But in this instance, do I understand you to say, that this car, the Pontiac, never got back into this northbound lane?

"*A.* That is, yes. That's right; yes, sir.

\* \* \*

"I am saying that at impact the Cadillac was in its southbound lane. The Pontiac was proceeding northbound with about a foot and a half of the vehicle in the northbound lane and the remaining part of the car in the southbound lane.

\* \* \*

"*A.* Well, in my opinion the Cadillac didn't strike the Ford from the physical evidence.

"*Q.* Mr. Billings, you are predicting this upon the pictures, number one, is that correct?

"*A.* Yes, I am taking advantage of the photographs.

\* \* \*

"*Q.* Mr. Billings, this morning you stated you had formed an opinion. Could I ask you when that opinion was formed?

"*A.* (*referring to papers.*) February 1963 I had come to that conclusion pretty much, yes.

"*Q.* Prior to last Monday, had you ever spoken to Trooper Richard Brantner?

"*A.* No, I never had.

"*Q.* Prior to last Monday, had you ever spoken to Mr. and Mrs. Gutekunst?

"*A.* No."

The jury returned a verdict for defendant. Motions for new trial and for rehearing were denied. The Court of Appeals affirmed. 14 Mich App 260. We granted leave to appeal. 382 Mich 792.

## II.

### OF THE TESTIMONY AND OPINIONS OF EXPERTS

Few lawsuits can be tried in this, the age of experts, without the use of expert testimony. Crim-

inal cases frequently require testimony by a finger-
print expert, a handwriting expert, or a lab
technician. Cases involving lands often turn on the
expert testimony of land surveyors. Lawsuits over
the performance or non-performance of construc-
tion contracts almost invariably involve the testi-
mony of experts in the field of engineering or struc-
tural design. Seldom is a malpractice case tried
without expert testimony from doctors. Products
liability cases depend in large part upon expert
testimony for plaintiff and defendant. Other
examples can be drawn from almost every kind
of litigation.

Yet distrust of the expert persists. This is par-
ticularly the case when, as a witness, he undertakes
to give his opinion. His expertise, when used to
supplement facts for the benefit of the jury, is less
often subject to objection.

The problem can be illustrated if we take the
simple case of a French witness who is unable to
speak English and whose testimony must be pre-
sented to the jury through a translator. If the
translator is fluent in both French and English, if
he faithfully gives to the jury the statements of
the witness, no one questions such a procedure.
However, if the translator is inept, incompetent or
biased in favor of one of the parties so that there
is an unfaithful or speculative translation of the
words of the witness, the procedure becomes sub-
ject to attack. The jury is better off without such
testimony. The use of an expert is similar to that
of a translator—the evidence which has been pre-
sented to the jury cannot be adequately compre-
hended, analyzed and weighed by it without the aid
of the special knowledge of the expert as to the
meaning and significance of the facts in evidence.

It is well understood nowadays that fingerprints found at the scene of a crime, if they can be identified as being the same as those taken from a defendant, may be a vital link in establishing his guilt. Fingerprints are like a foreign language. It takes the work of the fingerprint expert *and his opinion* with regard to identification to forge that vital link.

Since the testimony of experts is frequently used and is often vital to assist a jury in ascertaining the true facts of a case, what are the rules governing the admissibility of such testimony?

*1. There must be an expert.* In the professions and in most scientific disciplines, specific areas of expertise are readily recognized. The test of an expert presents no difficulty. In other areas, it is quite as easy to recognize that no valid expertise exists. A water dowser who purports to find water with the aid of a willow wand could scarcely qualify as an expert on subterranean waters, while a scientifically trained and experienced student of the subject might do so. A policeman with an eighth grade education who has been on traffic duty for ten years and has investigated innumerable traffic accidents may have limited credentials as a traffic expert, while a laboratory technician, never at the scene of an accident, who has analyzed paint samples taken from cars at the scene may be qualified to testify as to whether the cars came into contact.

*2. There must be facts in evidence which require or are subject to examination and analysis by a competent expert.* Fingerprints must have been found at the scene of the crime and must also have been taken from the defendant before an expert can present his findings to the jury. The X-ray of plain-

tiff's chest must be identified as such, also as to the date when taken, etc., before the radiologist can give his reading of it to the jury.

*3. Finally, there must be knowledge in a particular area that belongs more to an expert than to the common man.* This is the most difficult test of all. The application of it depends upon the relation of expert knowledge to common knowledge at a given time. We need no expert today to tell us that the world is round—or that disease is spread by germs —or that man can travel to the moon. Yet certain experts will be much more capable than the common man of measuring the speed of an oncoming automobile, of calculating the stresses and strains upon a given roof at a given time and in a given place, and of determining the location of a section corner.

## III

### THE EXPERT TESTIMONY TESTED

Defendant called William E. Billings as an expert witness and by his testimony undertook to reconstruct defendant's version of the accident. Plaintiff assigns the admission of this evidence as error, calling it "a hodge-podge of assumptions, conjectures and conclusions, stated as facts." The significant portions of Billings' testimony have been set out in the forepart of this opinion. We do not condemn its admissibility in its entirety.

One of the crucial issues in this case was: which of the two vehicles, the Cadillac or the Pontiac, was in the wrong traffic lane at the time of the collision? The point of impact was all-important. Billings approached his analysis of the known physical conditions by a preliminary discussion of "the forces of collision." This was testimony explaining the laws of inertia and the effect on each car. This informa-

tion is not ordinarily within the knowledge of the common man. The description given by the witness would likely be beneficial to the jury in its assessment of the evidence and its admission under this record was proper. In attempting to fix a point of impact, Billings gave his opinion as to the relative speed of the two cars which he undertook to substantiate by defining and applying momentum and deflection. He gave his explanation of why the location of tire marks, dirt and debris in the northbound traffic lane was not inconsistent with his expressed belief that the point of impact was in the southbound traffic lane. This testimony was vital in the defense of the case and challenged the credibility of the testimony of Officer Brantner. It had the further purpose of furnishing a basis to support the expert's opinion. Its admission as evidence did not constitute prejudicial error.

Billings had prepared a drawing of the accident scene to a scale of one inch equals ten feet and upon which he had indicated the final positions of the Pontiac and the Cadillac cars based on measurements given him by Officer Brantner, photographs in evidence, and oil marks still visible in the grass and on the shoulder when he made his investigation. Billings testified that the gouge marks shown on his drawing were to scale and located on the basis of the photographs. He stated that in his opinion they were caused by the buckled frame members of the Pontiac car. This was not expert testimony but an assumption or conclusion of the witness. If proper objection had been made, it should have been excluded.

In a somewhat argumentative narration, Billings attempted to prove the angle of collision between the Cadillac and the Pontiac cars. A portion of his testimony was based on the extent of the damage to

the left side of the Pontiac, which he observed for
the first time when he made his own examination of
the vehicle. That examination was made September
22, 1962—four months following the accident—and
at the Doss Auto Parts, being the second location to
which the Pontiac had been moved from the accident
scene. Billings admitted the damage to which he
referred was not shown by the photograph of the
Pontiac car. His observations were too remote and
his testimony of the damaged condition was received
without an adequate foundation having been first
laid to give it probative value. This portion of the
testimony should have been excluded under proper
objection.

By using photographs, Billings undertook to
point out to the jury that rear bumper damage on
the left side of the Ford was especially indicative
of how the accident occurred. Billings contended
that since the photographs showed the bumper to be
pushed in and forward into the corner of the Ford,
it substantiated his opinion (already given) that
the Pontiac was undertaking to pass the Ford just
prior to the accident but was unable to do so be-
cause of the approaching Linehan Cadillac. In an
attempt to drop back into his own lane, the driver
of the Pontiac, according to the opinion of Billings,
caught the right side of the front bumper of the
Pontiac in the left side of the rear bumper of the
Ford, causing the rear of the Ford to kick around to
the right and the Pontiac to run head-on into the
Cadillac. It is undisputed that the Ford spun across
the paved highway and into a farmer's fence along
the west boundary of the roadway at a point ap-
proximately 600 feet to the north. There was testi-
mony by the occupants of the Ford that the rear of
the car was up against the corner post of the fence
when the Ford came to rest and that the left rear

fender was down into the wheel so that the car could not be moved. The fender was ultimately pulled away from the tire by using the wrecker. Upon this record, the opinion of Billings as to how the accident occurred based on the evidence of physical damage to the Ford was purely speculative. The preliminary factual foundation was wholly inadequate to permit him to express an expert opinion, if such it may be called.

After stating his qualifications, Billings began his testimony on direct examination by giving his opinion as to how the accident occurred based on his own investigation. He undertook to fix the blame for the accident. This was error. Unlike some situations, such as actions for malpractice, there was nothing so exceptional in the record of this case as to require an expert opinion on the ultimate issue for the jury.

John Gutekunst, on cross-examination, made the statement that when he first observed the Cadillac car turning toward him it was about one and one-half car lengths away and that he explained: "My God, Carol, look at this guy coming at us." Gutekunst estimated the speed of the Ford at the time at about 60 miles an hour. In an obvious attempt to discredit this witness, counsel for defendant interrogated Billings as to the length of a Cadillac car and by use of a stop watch had Billings announced the time it took counsel to repeat the remark Gutekunst said he made to Carol. Billings then testified that at a speed of 60 miles an hour a vehicle would travel 88 feet a second. Under an assumption by counsel that the Cadillac was also traveling at a speed of 60 miles an hour, Billings computed and testified that the closing time of the two cars would have been 16/100ths of a second. The witness also testified as to the normal reaction time of a 25-year-

old man in braking a car. The information obtained through the answers of Billings cannot be classed as common knowledge. Presumably it would be helpful to the jury in its evaluation of the Gutekunst testimony. There was no error in this respect.

Our determination that prejudicial error was committed by the trial court in its rulings on the admission of expert testimony makes it unnecessary to consider the other assigned errors which, in any event, because of their nature are unlikely to recur on a retrial. The judgments in the Court of Appeals and in the circuit court are reversed and the case remanded to the circuit court for a new trial. Costs to the appellant.

T. M. Kavanagh, C. J., and T. E. Brennan, T. G. Kavanagh, and Swainson, JJ., concurred with Adams, J., Black, J., concurred in the result.

Williams, J. (*concurring in result*). I concur with the result in this case for reasons stated in my concurring opinion in *People* v. *Zimmerman*, (1971), 385 Mich 417, decided today. In the *Zimmerman* case, Billings would have testified in two different areas of expertise. First, as to speed from skid marks, there was an inadequate showing of data that the state of the art is developed to the point that it has a reasonable degree of reliability. Second, as to speed plus impact, there was no showing of the state of the art or the witnesses' qualifications in the area.

The facts of this case involve accident reconstruction which is an expertise different in nature and degree from those involved in *Zimmerman*. The opinions offered here relate to the place and angle of impact including a determination of the course of the automobiles prior to the accident. Michigan

courts have in the past admitted place of impact
testimony.[1] This Court, however, has not had oc-
casion to consider the state of the art as to the
course of automobiles prior to accident based on
angles of impact, etc. There is no satisfactory show-
ing of the state of the relevant art in this case nor
the qualification of the expert therein.

Justice Adams adequately portrays the capacity of
Billings to wander about in speculation and assump-

[1] *Dudek* v. *Popp* (1964), 373 Mich 300. (Police officers held quali-
fied to render opinion as to place of impact based on investigation
of scene, debris, etc.)

*Magda* v. *Johns* (1964), 374 Mich 14. (Police officer may testify
as to location of defendant's car on the highway at the point of
collision based on location of debris in the road, tire tracks, etc.)
This case apparently resolves the conflict purportedly created by
*Washburn* v. *Lucas* (1964), 373 Mich 610, in which unsupported
conclusions of fact were offered by a police officer without objec-
tion but the Court nonetheless expressed strong opinions as to their
highly inadmissible character.

*Woolner* v. *Ponicki* (1966), 3 Mich App 590. (Police officer's tes-
timony as to point of impact based upon examination of debris was
admissible. The issue, however, was not really presented as to
whether or not he may testify but rather whether there was error
in refusing the use of a blackboard.)

*LaFave* v. *Kroger* (1966), 5 Mich App 446. (Error to exclude
testimony of police officer as to point of impact in a head-on
collision based upon debris and other data at the scene of the in-
vestigation.)

*Coles* v. *Galloway* (1967), 7 Mich App 93. (Successive collision
involving two defendants; Billings testified for plaintiff, police officer
and Manos testified for two defendants. Court in passing said
Billings was qualified to render an opinion on the events of the
collision but the issue raised was not whether any witness was quali-
fied but rather that the defendant had no notice of Billings' testi-
mony as prescribed by rules of procedure.)

*Schweim* v. *Johnson* (1968), 10 Mich App 81. (Police officer gave
opinion as "qualified" witness but the issue raised on appeal was
whether absence of objection bound the party to his qualifications.
Held, failure to raise objection is a waiver.)

*Cook* v. *Kendrick* (1969), 16 Mich App 48. (Police officer not
shown to be qualified to testify as to facts of three-car accident.)

*Brummitt* v. *Chaney* (1969), 18 Mich App 59. (Police officer may
render opinion on point of impact based merely on debris and skid
marks.)

*Hoffman* v. *Rengo Oil Company, Inc.* (1969), 20 Mich App 575.
(Police officer held qualified to testify as to point of impact where
he would render no "legal conclusions.")

*Motorists Mutual Insurance Company* v. *Howard* (1970), 21 Mich
App 146. (Police officer may testify as to point of impact based
merely on debris and skid marks.)

tion in the reconstruction of the facts of this case. In addition to what I have said in *Zimmerman,* I would add the following brief comments.

It is apparent from the literature on the subject that even the best men make gross errors resulting, for example, from the unknown applicability of peculiar principles of crash dynamics. Very little experimentation has concerned the precise issue of crash testing with a view to determining why the crash occurred as it did. Most experimentation to date has involved tests designed to assess the causes of damage to the occupant, or the causes of buckling of particular structural members. The Highway Safety Research Institute, for example, has conducted substantial experimentation in the area of damage to occupants, but are just beginning a program using skid marks and other factors as determinants of trajectory to see whether a car is "out of control" in the scientific sense.

The Federal government has recently funded the Cornell Aerospace Laboratories to begin a school for training accident investigators. How soon any reliable data may be available from these sources is not known, but for the present it is clear that this "science" is in its gestation period.

I would remand this case for a determination along the lines previously indicated in *Zimmerman* with particular attention to establishing a satisfactory state of the art and the qualification of the witness in the exact area in which it is desired he testify before allowing either Billings or Trooper Brantner to testify as to their *opinions* on the point of impact and more especially the course of vehicles prior to impact.[2]

---

[2] Trooper Brantner may certainly testify as to the facts he observed in his investigation. How far he may go beyond this will depend upon the trial court's determination. In this regard the analysis

of the court in *Deaver* v. *Hickox* (1967), 81 Ill App 2d 79 (224 NE2d 468), may be of help.

See also *Jackson* v. *Trogan* (1961), 364 Mich 148. (Inexperienced police officer held unqualified to testify as to speed based on force of impact where there was insufficient evidence of skid marks and he was unable to corroborate his opinion by mathematical computations. The number of factors made his opinion too speculative.)

With regard to the qualifications of Billings in this area Justice ADAMS points out that the witness has had no actual experience in controlled experiments. The qualifications noted in *Snyder* v. *New York Central Transport Company* (1966), 4 Mich App 38, should be noted by yay of comparison.