PEOPLE v LYONS

Docket No. 78-2253. Submitted June 7, 1979, at Lansing.—Decided
      October 15, 1979.

      Defendant, Charles M. Lyons, was charged with embezzlement,
      fraudulent practices under the Uniform Securities Act and
      failure to obtain a license as a securities broker-dealer or agent.
      Defendant, a veteran insurance salesman, began a company
      specializing in the sale of deposit term life insurance by demon-
      strating to potential customers how they could profitably take
      the cash surrender value of their whole life policies, purchase
      deposit term insurance at a lower rate and use the balance for
      investments or other purposes. The charges arose out of a
      transaction with Mr. and Mrs. Reed. Burnett Marus, a sales-
      man for defendant's firm, first met with the Reeds and recom-
      mended that they surrender their whole life policies, buy
      deposit term insurance and invest the difference. Defendant
      and Marus both met with the Reeds later, at which time
      defendant told them about investment possibilities in oil and
      gas partnerships, limited real estate partnerships, apartment
      buildings and the Channing Mutual Fund, an open-end invest-
      ment firm in which persons could buy shares. Upon defendant's
      oral promise to put their money into an investment vehicle like
      the Channing Fund or an interest-bearing account at 7%, Mrs.
      Reed gave defendant a check made out to his company for
      $10,000. She later tendered an additional $5,000. About two
      months later Mr. Reed phoned Marus and intimated he wanted
      his $15,000 back. Defendant phoned Mrs. Reed and informed
      her that the money had been deposited in National Premium
      Budget Investments and promised its return within 30 days.
      The checks had actually been deposited in the company's
      business account and the funds used to pay agent's commis-
      sions, provide defendant with personal cash and company
      finances and discharge defendant's child-support obligations.
      Defendant contended that he never offered to sell securities to

REFERENCES FOR POINTS IN HEADNOTES

[1] 73 Am Jur 2d, Statutes § 293 et seq.
[2, 4] 69 Am Jur 2d, Securities Regulation—State §§ 12, 102.
[3] 31 Am Jur 2d, Expert and Opinion Evidence §§ 2, 69.

the Reeds, that he had promised to invest the funds at 7% and that the Reeds had made a short-term loan to his company. He explained that he lied to Mrs. Reed about the location of the money because Marus and another agent burst into his office while he was with clients, demanding that he speak to Mrs. Reed. He said he was shocked at the intrusion and made up the story so he could return to his clients. Defendant was convicted of the fraudulent practices charge and acquitted of the other two charges in the Washtenaw Circuit Court, Ross W. Campbell, J. Defendant appeals. *Held:*

Statutes imposing criminal penalties are to be strictly construed and a defendant cannot be convicted under the language of a statute unless his acts are clearly and unequivocally encompassed by its terms. Criminal statutes should be construed in light of the evil addressed so as to effectuate the end purpose of the legislation. The purposes of the Uniform Securities Act are to protect the public against fraud and deception in the issuance, sale, exchange or disposition of securities by requiring the registration of certain securities and transactions and to prevent stockholders and promoters from perpetrating frauds on unsuspecting investors in hazardous undertakings and to protect credulous and incompetent persons from their own inclinations to speculate in hazardous enterprises. The fraud charged had no relation to the securities discussed by defendant with the Reeds. The obtaining of money under a false promise to invest the money in securities does not bring the fraud within the purview of the Uniform Securities Act.

Reversed and the charge dismissed.

V. J. BRENNAN, J., dissented. He would hold that the obtaining of money under a false promise to invest it in securities does fall within the purview of the Uniform Securities Act. He would affirm.

### OPINION OF THE COURT

1. CRIMINAL LAW — STATUTES — STATUTORY CONSTRUCTION — SECURITIES.

   Statutes imposing criminal penalties are to be strictly construed and a defendant cannot be convicted under the language of a statute unless his acts are clearly and unequivocally encompassed by its terms; thus, one who obtains money upon the false promise to invest the money in a security is not guilty of fraudulent practices under the Uniform Securities Act because the fraud is not "in connection with the offer, sale or purchase of any security" (MCL 451.501[3]; MSA 19.776[101][3]).

2. CRIMINAL LAW — STATUTES — STATUTORY CONSTRUCTION — STATU-
TORY PURPOSE.

Criminal statutes should be construed in light of the evil ad-
dressed so as to effectuate the end purpose of the legislation;
the fraud of obtaining money by falsely promising to invest it
in securities is not a fraud contemplated under the purposes of
the Uniform Securities Act which are to protect the public
against fraud in the issuance, sale, exchange or disposition of
securities by requiring the registration of certain securities and
transactions and to prevent stockholders and promoters from
perpetrating frauds on unsuspecting investors in hazardous
undertakings.

3. WITNESSES — EXPERT WITNESSES — QUESTION OF LAW.

It is the general rule that courts will not permit even *expert*
witnesses to testify on a question of domestic law because it is
the exclusive responsibility of the trial judge to find and inter-
pret the applicable law.

DISSENT BY V. J. BRENNAN, J.

4. CRIMINAL LAW — STATUTES — SECURITIES FRAUD.

*The obtaining of money upon the false promise to invest it in a
security falls within the fraudulent acts prohibited by the
Uniform Securities Act (MCL 451.501; MSA 19.776[101]).*

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William F. Delhey,*
Prosecuting Attorney, and *James S. Sexsmith,*
Assistant Prosecuting Attorney, for the people.

*Donald F. Welday, Jr.,* for defendant.

Before: DANHOF, C.J., and V. J. BRENNAN and
H. R. CARROLL,* JJ.

DANHOF, C.J. Defendant was charged with em-
bezzlement, MCL 750.174; MSA 28.371, fraudulent
practices under the Uniform Securities Act (here-
inafter the Act), MCL 451.501(3); MSA
19.776(101)(3), and failure to obtain a license as a

* Former circuit judge, sitting on the Court of Appeals by assign-
ment pursuant to Const 1963, art 6, § 23 as amended in 1968.

securities broker-dealer or agent under the Act, MCL 451.601(a); MSA 19.776(201)(a). After a jury trial, he was convicted on the second count of fraudulent practices under the Act and acquitted of the other two charges. Defendant appeals as of right.

The facts, briefly summarized, are as follows. In 1972, defendant, a veteran insurance salesman, started his own company, Ann Arbor International Investment Planning (AAIIP), specializing in selling deposit term life insurance.[1] Using a sales technique perfected by defendant and an associate, an AAIIP sales agent would analyze a prospective client's existing whole life policies. He or she would then demonstrate that the client could more profitably take the cash surrender value of the existing policies, purchase deposit term insurance at a lower cost and use the remaining money for investments or other purposes of the client's choice. The agents were, however, warned during their training not to discuss particular investment possibilities with clients unless they were licensed to sell securities.

The prosecution's case was based on a course of events involving defendant, Burnett Marus, an AAIIP insurance agent and Loyd and Lucy Reed, AAIIP clients. Marus testified that he first met with the Reeds on October 22, 1973. In keeping with the company's sales technique, he recommended that they surrender their current whole

---

[1] As explained by Burnett Marus, a prosecution witness, deposit term life insurance provides a death benefit for a specific number of years. The insured pays an initial deposit of 1% of the face amount of the policy plus an annual premium. If the insured holds the policy until the maturity of the term, the deposit is returned with 10% interest.

Whole life insurance also provides a death benefit for a specific term, but has a savings program connected to it. The average whole life policy pays a 2.5% annual dividend or interest.

life policies, purchase deposit term insurance and invest the remainder of the cash surrender value. On November 21, 1973, defendant accompanied Marus to the Reed home and explained the advantages of deposit term insurance. The Reeds accordingly surrendered their existing policies, received a check for approximately $10,000 and bought deposit term insurance.

Marus further testified that, on January 12, 1974, he and defendant again met with the Reeds. Defendant told the Reeds about investment possibilities[2] in oil and gas partnerships, limited real estate partnerships, apartment buildings and the Channing mutual fund. According to Marus, the Reeds expressed a preference for an investment like the Channing mutual fund.[3] Upon defendant's oral promise to put their money "into an investment vehicle like the Channing fund" or an interest bearing account at 7% interest per annum, Mrs. Reed gave defendant a check for $10,000 made out to AAIIP. In February, 1974, the Reeds received a second check from their whole life policies. Mrs. Reed wrote another personal check for $5,000 to AAIIP.

Marus stated that AAIIP began disintegrating in March, 1974. Many of the agents, including Marus, resigned. In late April, 1974, Mr. Reed called Marus and intimated that he wanted his $15,000 returned to him. Defendant phoned Mrs. Reed on April 30, 1974, told her that he had deposited the money in National Premium Budget Investments in Lincoln Park, Michigan, and promised to return the money within 30 days. When Mrs. Reed tried

---

[2] Neither Marus nor defendant had a license to sell securities.

[3] Marus stated that the Channing Mutual Fund was an open-ended investment firm in which persons could purchase shares. The purchaser would not only receive interest or dividend income, but the principal investment would increase in value as the fund prospered.

to find this company, she discovered it did not exist.

The Reeds corroborated Marus's testimony. They both indicated their belief that defendant had promised to invest $15,000 for them in an interest bearing account and to return their money on demand. At the time of trial in March of 1978, defendant had repaid only $1,500 of their money.

The prosecution also introduced defendant's personal secretary as a witness to testify that the Reeds' checks had been deposited in the corporate checking account of AAIIP. Checks written on this account thereafter paid AAIIP's agents' commissions, provided defendant with personal cash and company finances, and discharged defendant's child support obligations to his ex-wife.

Defendant's defense was that he had never offered to sell securities to the Reeds, although securities had been discussed, and that he had promised to invest their $15,000 in AAIIP at 7% interest per annum. In other words, he asserted that the Reeds had made a short-term loan to his company. Defendant insisted that he still planned to return the Reeds' money with interest, but that his business and personal fortunes had declined precipitously since March, 1974. He also explained that he had lied to Mrs. Reed about the location of the money because Marus and another agent had burst into his office while he was with clients, demanding that he speak to Mrs. Reed. He was shocked by the intrusion and made up a story so that he could return to his clients.

Two former clients of AAIIP also testified for defendant that they had engaged in transactions with the company similar to that of the Reeds. On defendant's suggestion, both witnesses had loaned money to AAIIP and both had eventually been

repaid nearly all of the amounts loaned with interest.

Based on this set of facts, the second count of the information against defendant read as follows:

"[Defendant] did wilfully in connection with the offer, sale or purchase of securities, directly or indirectly engage in acts, practices or a course of business which operated as a fraud or deceit on Complainant's, to-wit: (1) Defendant, acting on behalf of and as an officer of Ann Arbor International Investment Planning, Inc. did receive $15,000 from Lucy and Loyd Reed in separate payments of $10,000 on 1/12/74 and $5,000 on 2/7/74. Said amount was paid to International Investment Planning, Inc., Defendant having represented to the Complainant's that the money was to be held by the firm in an interest bearing account and to pay at least 7% until a suitable investment was found for them. (2) That Defendant did thereafter comingle said monies in his business checking account. (3) That he advised Complainant's that their money was deposited in a certain place, when in truth of fact it was not. (4) That upon demand he has refused to return Complainants' monies contrary to his agreement, and contrary to Sec. 451.501(3), C.L. 1948, as amended; MSA 19.766(101)".

The provision of the Act under which defendant was charged, MCL 451.501(3), makes it unlawful for any person

"* * * in connection with the offer, sale or purchase of any security or commodity contract, directly or indirectly:

* * *

"(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."[4]

---

[4] The definition of a security under the Uniform Securities Act is as follows:

"(1) 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation

Defendant's argument on appeal is that the evidence does not support any finding of a security being offered, sold or purchased.[5] He insists that he did not ask the Reeds to invest risk capital in a particular organization, but rather to loan money to AAIIP at a 7% interest rate. Loans are specifically excluded from the definition of a sale under the Act. MCL 451.801(j)(6)(A); MSA 19.776(401)(j)(6)(A). See also *People v Breckenridge*, 81 Mich App 6; 263 NW2d 922 (1978).

We are not convinced by defendant's characterization of the evidence. The prosecution witnesses' testimony clearly tends to show that the Reeds did not intend to have their money commingled with AAIIP's finances, although the nebulous nature of defendant's purported promise to "invest" their money in "an interest bearing account" makes it difficult to determine what sort of transaction the parties anticipated, and whether it concerned a security or not. But even assuming an offer, sale or purchase of a security was somehow involved in defendant's dealings with the Reeds, we agree with defendant's general premise that the situation in this case does not fall within the purview of the

---

in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 'Security' does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or some other specified period." MCL 451.801(l); MSA 19.776(401)(l).

[5] Defendant made the same argument at trial in support of his motion for directed verdict on the second count of the information. The trial court denied the motion, ruling that there was sufficient evidence of a connection between the fraudulent acts alleged and the offer, sale or purchase of a security.

behavior criminally sanctioned under MCL 451.501(3).

Stripped to its essentials, the gravamen of the offense charged against defendant was that he converted the Reeds' checks to his own use contrary to his promise, then lied to them about the location of their money and, finally, refused to return it on demand. Defendant's allegedly fraudulent and deceitful acts were thus not *"in connection with* the offer, sale or purchase of any security" within the meaning of the Act, MCL 451.501(3). Defendant's act actually constituted a criminal conversion of money entrusted to him for another use.

One may argue that defendant's promise to "invest" the Reeds' money was linked to his future fraudulent course of action because defendant's promise occasioned his acquisition of their money. But defendant could just as well have vowed to buy the Reeds the Eiffel Tower or donate their money to charity; the promise, no matter what the content, was merely the vehicle by which he acquired their funds.

Statutes imposing criminal penalties are strictly construed. The defendant cannot be convicted under the language of the statute unless his acts are clearly and unequivocally encompassed by its terms. *People v Kirstein,* 6 Mich App 107, 113-114; 148 NW2d 539 (1967), *Bremer v Equitable Construction & Mortgage Corp,* 26 Mich App 204; 182 NW2d 69 (1970). The relationship between defendant's alleged fraudulent acts and the offer, sale or purchase of any security is too attenuated to establish the connection required by the language of MCL 451.501.

It is also well settled that criminal statutes should be construed in light of the evil addressed

so as to effectuate the end purpose of the legisla-
tion. *People v Dempster,* 396 Mich 700, 707-708;
242 NW2d 381 (1976), *People v Johnnie W Jones,*
12 Mich App 293; 162 NW2d 847 (1968), *People v
Loney,* 12 Mich App 288; 162 NW2d 832 (1968).
The purpose of the Act is to "protect the public
against fraud and deception in the issuance, sale,
exchange, or disposition of securities within the
State of Michigan by requiring the registration of
certain securities and transactions". *Dempster,
supra,* 704, quoting Schmidt & Cavitch, Michigan
Corporation Law (1974), p 1071. The Act also seeks
"to prevent stockholders and promoters from per-
petrating frauds and impositions on unsuspecting
investors in hazardous undertakings and to protect
credulous and incompetent persons from their own
inclinations to speculate in hazardous enterprises".
*Breckenridge, supra,* 14-15. The regulatory purpose
is, in short, to require full and honest disclosure of
the facts underlying securities transactions so that
buyers and sellers can properly appraise the value
of securities based on accurate information.[6]

The fraud charged by the prosecution had no
relation to the securities which defendant dis-
cussed with the Reeds. There was no allegation
that defendant mischaracterized market risks in-
volved or misled the Reeds about the nature of a
security. He simply failed to invest their money in
any securities at all. The regulatory scheme of the
Act was not meant to address this type of misap-

---

[6] We are aware of the tendency of courts to liberally construe the
language of the Uniform Securities Act. See, *e.g., People v Dempster,*
396 Mich 700, 704-711; 242 NW2d 381 (1976). See also generally, 79
CJS Supp, Securities Regulation, § 200, pp 481-483, concerning the
wide scope of fraudulent practices punished under the Uniform
Securities Act. Flexible interpretation of the Act is necessary if its
goal is not to be frustrated by the use of novel or atypical schemes.
But this liberality of construction should not include stretching the
language of the act to encompass evils not addressed within the
statutory purpose.

propriation of funds. Defendant's conviction for
fraudulent practices under the Act must therefore
be reversed and the charge dismissed.

Although not necessary to our decision, we
briefly address one other important issue. At trial,
the prosecution introduced Donald Gunn as an
expert witness on securities law. Gunn stated that
he had worked for 13 years as a corporation
auditor-investigator enforcing securities law
through the Michigan Corporations and Securities
Bureau. According to the guidelines established by
the Michigan Supreme Court, Gunn was qualified
as an expert. *O'Dowd v Linehan,* 385 Mich 491,
509-510; 189 NW2d 333 (1971), *Johnson v Detroit,*
79 Mich App 295; 261 NW2d 295 (1977). His
testimony also met the requirement of aiding the
jury to understand the complexities of the case
against defendant. *O'Dowd, supra.* Cf., *Dudek v
Popp,* 373 Mich 300, 305-306; 129 NW2d 393
(1964). See also MRE 702.

But the court erred in allowing Gunn to testify,
over defendant's objection, concerning the legal
definition of a security under the Act.[7] The general

---

[7] Gunn testified in part as follows:

"Q (BY MR. COOPER *[the prosecutor]):* Mr. Gunn, are you familiar
with the term interest bearing account?

"A Yes.

"Q What is an interest bearing account?

"MR. WELDAY *[defense counsel]:* I would object to that again,
Your Honor.

"THE COURT: I don't find that in the statute.

"MR. WELDAY: Pardon?

"THE COURT: I don't find that word in the statute.

"MR. WELDAY: I don't believe it is in the statute either, Your
Honor, and there has been no evidence that this man is qualified to
define that term as it may be known in law. He may have an opinion
and he may understand what it is, but that I am sure we all do. His
opinion must be that of an expert, if it is to be given, and I don't
think he has been qualified to tell us what an interest bearing
account may be. Perhaps a banker might be, but Mr. Gunn—

"THE COURT: Why doesn't the Prosecutor examine and see if he

rule is that courts will not permit even expert witness testimony on a question of domestic law because it is the exclusive responsibility of the trial judge to find and interpret the applicable law. McCormick, Evidence (2d ed), §§ 12, 335, pp 28-29, 776-777; 7 Wigmore, Evidence (Chadbourn Rev), § 1952, pp 103-104. See also *Marx & Co, Inc v Diners' Club, Inc,* 550 F2d 505 (CA 2, 1977), *Huff v United States,* 273 F2d 56, 61 (CA 5, 1959), *State v Ballard,* 394 SW2d 336, 340 (Mo, 1965).

The wisdom of this rule is demonstrated in the instant case. Gunn's testimony included a legal conclusion that an interest bearing account constituted an evidence of indebtedness within the meaning of the Act, MCL 451.801(1); MSA 19.776(401)(1). The jury asked to have the tape of Gunn's remarks replayed during its deliberations, while also requesting the trial judge to clarify the meaning of an evidence of indebtedness under

---

doesn't know what that account might be? Does he have expertise in that area?

"Q (BY MR. COOPER): Have you come across that term before, sir?

"A Yes.

"Q Are you familiar with it?

"A Yes.

"Q Have you had occasion to deal with that term on prior occasions?

"A Yes.

"Q In what capacity?

"A Well, we have certain entities that you can put money on deposit with and receive an income or interest on your investment or your depsoit, so to speak. This is a form of security.

"Q It is a form of security?

"A Yes.

"Q *How does an interest bearing account qualify, if you will, as a, quote, security under the Uniform Securities Act?*

"A *Well, I think it could qualify in one of two ways. It could be— there is evidence of indebtedness there. You have money on deposit. It is due you. It is a form of evidence of indebtedness. You might say it is another class of a profit sharing agreement. You are putting your money into an entity, you are hoping that money—that company or entity makes money to pay you interest that you have on deposit with the company.*" (Emphasis supplied.)

MCL 451.801(1). The judge assented to the first request, but stated privately to the prosecutor and defense counsel:

"I should point out that my opinion here differs from that of Mr. Gunn. *I have allowed Mr. Gunn to give testimony as an expert. The jury is at liberty to give that testimony such weight as they feel it deserves. Nonetheless, I can not delegate my role as trial judge to Mr. Gunn or any other expert where a question of law is involved,* and had the Legislature wished to have the more liberal interpretation both Mr. Gunn and the Prosecutor would place upon the term evidence of indebtedness, the remedy is simple: they can spell it out in the statute. But until and unless they have, I have to break this in favor of the Defense and take the conservative stance on the definition that I have." (Emphasis supplied.)

He then instructed the jury that "under the Michigan Uniform Securities Act evidence of an oral promise to pay back money, absent the issuance of a written instrument evidencing such promise to repay, is not evidence of indebtedness". The jury thus heard two varying, if not inherently contradictory, legal interpretations of a statutory term involved in the case.

Allowing witnesses to testify as to questions of law invites jury confusion and the possibility that the jury will accept as law the witness's conclusion rather than the trial judge's instructions. We would reverse on the basis of Gunn's erroneously admitted testimony.

Reversed and the charge against defendant dismissed.

H. R. Carroll, J., concurred.

V. J. Brennan, J. *(dissenting).* The majority's

disposition of the issue of fraudulent practices committed by defendant is based upon their characterization of defendant's actions as a criminal conversion of money entrusted to him for another use. However, the defendant's fraudulent acts connected with the offer to sell a security are sufficient to bring this case within the purview of the Uniform Security Act.

Section 101 of the Act provides:

"Sec. 101. It is unlawful for any person, *in connection with the offer,* sale or purchase of any security, directly or indirectly:

"(1) To employ any device, scheme or artifice to defraud.

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

"(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person." MCL 451.501; MSA 19.776(101). (Emphasis added.)

The Act defines security as follows:

"(1) 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 'Security' does not include any insurance or endowment policy or annuity contract

under which an insurance company promises to pay money either in a lump sum or periodically for life or some other specified period." MCL 451.801(1); MSA 19.776(401)(1).

Sale and offer to sell are defined in pertinent part as follows:

"(j) (1) 'sale' or 'sell' includes every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value.

"(2) 'Offer' or 'offer to sell' includes every *attempt or offer to dispose of,* or solicitation of an offer to buy, a security or interest in a security for value." MCL 451.801(j); MSA 19.776(401)(j). (Emphasis added.)

On January 12, 1974, defendant met with the Reeds and told them about oil and gas partnerships, limited real estate partnerships, apartment buildings, and the Channing mutual fund. After discussing the merits of several investment possibilities, the Reeds selected a program "like the Channing program". Mrs. Reed then gave the defendant a check for $10,000 made out to AAIIP. The defendant told the Reeds that this money would go into "an investment vehicle like the Channing Fund". Later another $5,000 was turned over to defendant.

Clearly the defendant was offerng a participation in a mutual fund which falls within the definition of securities set forth above. The fact that defendant never invested the money in a mutual fund but used the Reed's monies to pay not only his business creditors but his alimony and support payments indicates he never intended to invest the Reed's money. There was ample evidence which proved defendant's fraudulent intent. I would hold that the Act encompasses this type of activity and would affirm on this issue.