Frank Mette died on September 16, 1930. His last will and testament, executed on September 11th of that year, after a contest thereon by Margaret Konkel, was admitted to probate by the probate court for the county of Wayne. The contestant is the daughter of the deceased, and 25 years of age. Her father and mother were divorced when she was five years old, and she did not see him thereafter for seven years, and after that time but occasionally.
The reasons assigned for the contest here relied on are in brief: 1st, that the deceased was not mentally competent to execute a will; 2d, that it was not executed in conformity with law. On appeal *Page 227 
to the circuit court and trial by a jury, the will was disallowed. From the order so entered, the proponents have taken this appeal.
In the will, after providing for the payment of his debts and funeral expenses, he devised and bequeathed the residue of his estate to his daughter, Margaret, the contestant, his brothers, Joseph, Henry, Albert, and August, his half-brother, Anthony, his half-sisters, Elizabeth Miller and Theresa Durkee, and the pastor of St. David's Catholic Church, located on Outer Drive, Detroit, share and share alike. The fourth paragraph thereof reads as follows:
"I am not unmindful of the children of my deceased half-brother, John Mette, but I feel that they have been sufficiently provided for by whatever inheritance they received from the said John Mette."
The will was executed under the following circumstances: The deceased was admitted to the Receiving Hospital in Detroit on August 23, 1930. His name, address, and the nature of his employment were recorded. He stated that his nearest relative was Margaret Mette Konkel, the contestant herein. He was then of the age of 47 years, and lived alone. His brother Joseph first learned of his illness on August 25th, and went to the hospital to see him. When visiting him again on September 10th, deceased requested him to get an attorney to draw his will. Joseph called upon an attorney, Henry P. Fisher, and he telephoned his partner, Ray V. Richards, who was then at his home, and he went to the hospital and informed the deceased of the purpose of his visit. Mr. Richards testified that deceased then stated that the value of his property was around $12,000 to $14,000 (it was afterwards inventoried at $10,982.04, and its net value about *Page 228 
$7,500), and that he gave him full particulars as to the manner in which he desired his property to be distributed; that he wanted the Union Guardian Trust Company to act as his executor; that he made a written memorandum of the instructions so given him, had the will prepared pursuant thereto, and took it to the hospital the next morning for execution; that he read it to the deceased and then handed it to him, and that he looked it over and expressed his satisfaction with it; that at that time an interne at the hospital, Dr. Cooper, came to the bedside of the deceased and asked him how he felt; that he answered, "I feel pretty good, only this right leg is a little swollen," and showed it to the doctor; that he then introduced himself to the doctor and said, "I am an attorney and I have got Mr. Mette's will," and also said, "Do you think Mr. Mette is all right to sign a will?" and that the doctor answered, "Yes, as well as anybody else would be;" that he then asked him if he would act as a witness, and he said he would; that he then said to the deceased, "This is your will, is it?" and he replied, "Yes, it is; it is just what I want in my will;" that deceased, sitting up in his bed, signed his name to the instrument and the doctor and he signed as witnesses thereto, and that he at that time had no acquaintance with any of the parties named as beneficiaries in the will.
Dr. Cooper, who also signed as a witness to the signature of the deceased, testified as a witness in the probate court. He was at that time an interne, and not admitted to practice medicine. His deposition was taken and received in evidence in the circuit court. In it he stated (referring to deceased) that "the primary trouble was his heart disease * * * resulting in edema, or the fluid in the blood, *Page 229 
and the fluid in the blood, which flowed from the blood itself out into the tissues was all dammed back into the tissues;" that "along with that he had kidney disease, evidenced by his urinary findings," and further said that his condition was what is commonly called dropsy; that it "affects the brain as well as any other tissues, * * * producing cloudiness." He stated that it was his "impression," based on his observation, that while in the hospital the deceased "was either in one of these periods of disorientation, or in one of the intermittent periods of more or less cloudiness," and that, as he recalled it, there was no time that he "could say that his mind was perfectly normal." He admitted that he signed his name as a witness at the request of Mr. Richards, but stated that he was not informed that it was the will of the deceased; that Richards did not sign his name as a witness in his presence, and that it was his "impression" that the deceased "did not have mental capacity at that time to execute any document, any legal document." Under cross-examination he admitted that in the probate court, on being asked concerning statements somewhat contradictory to those in his deposition, he many times answered, "I don't remember," and on one occasion refused to answer on account of incriminating previous testimony." He further testified:
"Q. Are you in the habit, doctor, of signing all papers as a witness, signing any old paper that is handed to you?
"A. We have been over at the hospital, signing witness' signatures.
"Q. You would not sign anything knowingly where the person was insane, would you?
"A. Why, certainly, if he could write his name, I would witness his signature. *Page 230 
"Q. It would not make any difference to you if he was insane or not?
"A. Not knowing the case at all, no."
The trial court instructed the jury, in effect, that Dr. Cooper must have been informed that the document to which he signed his name as a witness was the will of the deceased in order to render it valid.
"Publication signifies the act of declaring or making known to the witnesses that the testator understands and intends the instrument subscribed by him to be his last will and testament. Unless required by statute publication of a will is unnecessary." 40 Cyc. pp. 1116, 1117.
In Danley v. Jefferson, 150 Mich. 590, 593
(121 Am. St. Rep. 640, 13 Ann. Cas. 242), it was said:
"Our statute does not specify publication as a requisite to the validity of a will."
And in Re Kennedy's Estate, 159 Mich. 548, 558 (28 L.R.A. [N. S.] 417, 134 Am. St. Rep. 743, 18 Ann. Cas. 892):
"No publication of the instrument is required in this State to give it effect, but the execution of an instrument in testamentary form with the statutory formalities completes the testamentary act."
There was error in this instruction as given, and, as the jury may have based their verdict upon it, reversal must be had for this reason.
In view of the testimony of Dr. Cooper, it cannot be said that the question of the mental incompetency of the deceased should not have been submitted to the jury. On motion for a new trial, alleging that the verdict in this respect was against the great weight of the evidence, the trial judge said: *Page 231 
"The court frankly states that he believes that the weight of the testimony was with the proponent," but he was — "not disposed * * * to interpose his judgment arbitrarily against the finding of the jury."
A careful reading of the record discloses that the verdict can best be accounted for by the fact that Mr. Richards appeared as a witness and as one of the attorneys for the proponents and cross-examined Dr. Cooper. He had practiced his profession for about 15 years. His integrity was not questioned, and yet such conduct on his part may have had its influence with the jury in determining the weight to be given to his testimony.
In Re Lewandowski's Estate, 236 Mich. 136, 146, the following from Jacobs v. Weissinger, 211 Mich. 47, 49, was quoted with approval:
"It is, we think, to be regretted that an attorney of record in the case should find it necessary to support the contention he is bound to make with his own testimony. It is a practice not to be commended, and, while such testimony is competent, its consideration by the court is always a matter of embarrassment, because it is difficult to distinguish between the zeal of the advocate and the fairness and impartiality of a disinterested witness. The practice has received judicial attention in many cases and has found scant approval."
The judgment entered is reversed, with costs to proponents, and a new trial granted.
CLARK, C.J., and McDONALD, POTTER, NORTH, FEAD, WIEST, and BUTZEL, JJ., concurred. *Page 232