MEEHAN v MICHIGAN BELL TELEPHONE COMPANY

Docket No. 94088. Submitted January 5, 1988, at Detroit. Decided February 6, 1989.

Plaintiff, Raymond W. Meehan, was arrested for allegedly receiving and concealing certain microfiche which contained the names and addresses of unpublished customers of defendant, Michigan Bell Telephone Company. The charges were later dismissed because the microfiche found in plaintiff's home were copies and not originals of defendant's microfiche. Plaintiff was also arrested seven days after his initial arrest on a nonsufficient-funds charge which was brought without a citizens complaint. Defendant was allegedly involved in putting pressure on the prosecutor's office to bring such charge. Plaintiff then brought an action in the Wayne Circuit Court against defendant alleging malicious prosecution and abuse of process. Following a jury trial, plaintiff was awarded $195,000. The trial court, Susan D. Borman, J., entered a judgment on the verdict tripling the award pursuant to statute, for a total of $585,000, and adding the statutory twelve percent annual interest compounded from the date of filing the complaint. Defendant's subsequent motion for new trial or judgment notwithstanding the verdict was denied. Defendant appealed alleging several errors.

The Court of Appeals *held:*

1. The trial court properly managed the admission of the evidence and instructed the jury.

2. The trial court did not err in permitting Bruce Leitman, plaintiff's attorney in the underlying criminal action, to testify as an expert witness. To the extent that some of Leitman's

REFERENCES

Am Jur 2d, Appeal and Error §§ 700, 885, 886; Damages § 818; Expert and Opinion Evidence §§ 16 *et seq.*; Malicious Prosecution §§ 45 *et seq.*; New Trial §§ 137 *et seq.*; Trial § 590.

Attorney as witness for client in civil proceedings—modern state cases. 35 ALR4th 810.

Excessiveness or inadequacy of compensatory damages for malicious prosecution. 50 ALR4th 843.

Validity and construction of state statute or rule allowing or changing rate of prejudgment interest in tort actions. 40 ALR4th 147.

testimony invaded the province of the jury, such error was harmless. No error occurred in regard to the remainder of Leitman's testimony.

3. Defendant's claim of error regarding the admission of evidence of publicity about and pleadings from a separate Washtenaw Circuit Court action brought against defendant by a third party was waived.

4. The trial court did not err in denying defendant's motion for judgment notwithstanding the verdict or for a new trial.

5. There was evidence to support finding an abuse of process.

6. Prejudgment interest was properly awarded on the trebled judgment.

7. The verdict was not secured by improper methods, prejudice or sympathy and is not excessive. The verdict does not shock the judicial conscience.

Affirmed.

MacKENZIE, P.J., concurred in the result only.

1. EVIDENCE — EXPERT TESTIMONY.

It is within a trial court's discretion to admit or exclude expert testimony; an exercise of such discretion will not be reversed on appeal except where it has been clearly abused.

2. EVIDENCE — EXPERT TESTIMONY — QUESTIONS OF LAW.

The general rule is that courts will not permit even expert witness testimony on a question of domestic law because it is the exclusive responsibility of the trial judge to find and interpret the applicable law; however, when an expert's opinion states the domestic law consistent with the applicable statute and the trial court's jury instructions, the error is harmless.

3. EVIDENCE — OPINION TESTIMONY — ULTIMATE ISSUES.

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact (MRE 704).

4. EVIDENCE — EXPERT TESTIMONY — OPINION TESTIMONY.

If a trial court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise (MRE 702).

5. APPEAL — MOTIONS AND ORDERS — JUDGMENT NOTWITHSTANDING THE VERDICT.

An appellate court reviews a trial court's denial of a defendant's

motion for judgment notwithstanding the verdict by viewing the evidence and all legitimate inferences therefrom in a light most favorable to plaintiff and determining whether the evidence was sufficient to establish a prima facie case; the motion is properly denied if the evidence presented could have led reasonable jurors to reach differing conclusions.

6. NEW TRIAL — MOTIONS AND ORDERS.

The granting of a motion for a new trial alleging that the verdict is against the overwhelming weight of the evidence is within the sound discretion of the trial court, which must not substitute its judgment for that of the jury; a trial court may grant a motion for new trial when the verdict is against the overwhelming weight of the evidence.

7. TRIAL — JURY INSTRUCTIONS.

Where a party asks for an instruction which is partly good and partly bad, it is proper to refuse it altogether.

8. ACTIONS — ABUSE OF PROCESS.

Two elements are necessary to an action for the malicious abuse of legal process: (1) the existence of an ulterior purpose, and (2) an act in the use of the process not proper in the regular prosecution of the proceeding; the regular and legitimate use of process, though with a bad intention, is not a malicious abuse of process.

9. ACTIONS — ABUSE OF PROCESS.

An action for the abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue.

10. APPEAL — PRESERVING QUESTION.

It is not up to the Court of Appeals to discover and then to rationalize the basis of a party's claims; a statement of position without supporting authority is insufficient to preserve a claim for appeal.

11. INTEREST — PREJUDGMENT INTEREST — MALICIOUS PROSECUTION.

Prejudgment interest is properly allowed on the full trebled amount of a plaintiff's recovery in an action for malicious prosecution (MCL 600.2907; MSA 27A.2907).

*Ronald R. Gold* and *Thomas C. Taylor,* for plaintiff.

*Cross, Wrock, Miller & Vieson* (by *W. Robert*

*Chandler* and *Jesse C. Vivian*), and *Michael A. Holmes*, of Counsel, for defendant.

Before: MacKENZIE, P.J., and MICHAEL J. KELLY and L. P. BORRELLO,* JJ.

L. P. BORRELLO, J. Following a jury trial which began on February 7, 1985, and ended March 14, 1985, plaintiff, Raymond William Meehan, was awarded $195,000 in his suit against defendant, Michigan Bell Telephone Company, for malicious prosecution and abuse of process. On April 26, 1985, the trial court entered judgment on the verdict tripling plaintiff's award pursuant to MCL 600.2907; MSA 27A.2907, for a total of $585,000, and adding the statutory twelve percent annual interest compounded from the date of filing the complaint. Defendant filed a motion for new trial or judgment notwithstanding the verdict, which the trial court denied. Defendant appeals as of right. We affirm.

Plaintiff, who was not, and never had been, an employee of defendant, was arrested on January 22, 1979, for allegedly receiving and concealing certain microfiche which contained the names and addresses of defendant's nonpublished customers. Plaintiff's defense was that the microfiche, or "white knights," were either discarded by defendant or made available by companies defendant hired to dispose of its out-of-date microfiche. The charges against plaintiff were dismissed because the microfiche found in plaintiff's home were copies and not originals of defendant's microfiche.

Plaintiff sued defendant for malicious prosecution and abuse of process, alleging that when defendant instigated his arrest it knew that the microfiche found in plaintiff's home were copies.

* Circuit judge, sitting on the Court of Appeals by assignment.

A Michigan Bell "white knight" is a three-volume directory reprint which contains all the information in the regular telephone directory, i.e., names, addresses, and telephone numbers of listed customers, plus the names and addresses of nonpublished customers, but not their telephone numbers. The white knights were transferred from paper to microfiche between 1975 and 1978. The microfiche "white knights," four-inch by six-inch negative-type films, which must be put into a viewer to be enlarged, contained the same information as the paper directories. White knights are used by credit offices. White knights bear a logo which reads: "Private property of Michigan Bell Telephone Company for their use only. Not to be reproduced or removed from company property."

A credit manager of a jewelry company testified that he had been in the credit collection business since 1947 and that defendant's white knights are one of the various directories used in the business to aid in finding people. The jewelry store credit manager knew of plaintiff's involvement with white knights going back to 1973 and that plaintiff had sold microfiche to others. The credit manager also testified that the logo was generally ignored in the trade and opined that the warning was merely directed to defendant's employees.

An internal audit dated November 7, 1978, indicated that security of related microfiche was very weak. Contracts for disposal of the related microfiche did not contain language specifying confidentiality of the records. In 1978, the microfiche with the actual nonpublished telephone numbers were destroyed in-house, but the directory reprint microfiche, i.e., the microfiche with only the names and addresses of the nonpublished customers, was placed in barrels at defendant's micrographic center, picked up by outside contractors, and taken to

the city incinerator. Incinerator slips received at the end of the process indicated tonnage only and would not indicate whether a few packages of microfiche were not incinerated.

In December of 1978, defendant's investigator, Richard Selke, asked defendant's micrographic facility manager to meet with him and two individuals from the Oakland County Prosecutor's Office in order to determine whether certain microfiche belonged to defendant.

A first-generation microfiche is the first copy which is distributed within the company to, among others, the information operators. A copy, or second-generation, is made from raw stock which comes from the manufacturer with a white stripe on it. The microfiche that Selke had at the meeting was duplicated from a previous microfiche with white stripes. Defendant's micrographic facility representative knew this because the title, which was on the white stripe, was unreadable.

A representative of Bresser's Cross-Index Directory, another source used to locate people, testified that they had used white knights in their business since the 1960's. A number of people brought white knights to Bresser's and there was nothing secretive about buying them from vendors.

Plaintiff was a client of Bresser's. Plaintiff leased the Bresser's Cross-Index Directory and sold white knights to Bresser's. Bresser's never looked to see if there was a logo on white knights it purchased. The logo's presence would not have mattered, because white knight usage was so common.

Bresser's had ten or twelve sources from which it could purchase used microfiche. Bresser's first acquired white knights from a Yellow Pages salesman who brought them as a courtesy. Eventually, Bresser's was told that it had to procure the

microfiche itself and was directed to the back of defendant's Bethune station, where the microfiche were in the trash. The Bresser's representative testified that he collected white knights from that location and also from a location in Southfield. In the middle of the day, he would walk in and ask where the white knights were located. Someone would direct him to a corridor. No one ever said he could not take them.

After plaintiff's arrest on January 22, 1979, defendant's head of corporate security, Larry York, still tried to find out if an employee was involved, which he admitted was defendant's "basic motivation from the beginning." York verified the accuracy of a transcript of a January 26, 1979, radio broadcast which stated:

> Well, my staff is working hand-in-hand with the staff of L. Brooks Patterson. As you know, charges have been filed. We have filed complaints against two men who have been arrested for receiving and concealing stolen property and, of course, the investigation is continuing by my staff and by Mr. Patterson's staff.

Because the microfiche seized from plaintiff and Glen Lasuita, who was arrested two months before plaintiff, contained the proprietary marking on them (the "logo"), it was concluded that they were stolen.

Plaintiff's twenty-five-year-old daughter testified that she was living at home on January 22, 1979, when three men came to the door with a legal document to search the house. Selke, who held the document, was accompanied by two police officers. The men primarily searched the bedroom which plaintiff used as an office. Selke came out of the bedroom with microfiche in his hand, said that that was what they were looking for and that they

had found "stolen property from Michigan Bell." Selke told plaintiff's daughter and wife to summon plaintiff.

When plaintiff arrived home, he was arrested and taken away. Plaintiff's son testified that plaintiff was handcuffed and that it was defendant's employee, Richard Selke, who told the plaintiff that he was under arrest.

Selke admitted that he accompanied persons from the Oakland County Prosecutor's Office to the Rochester District Court to get a search warrant for plaintiff's home. He further admitted that he knew on January 22, 1979, when he went to identify the microfiche, that the microfiche in plaintiff's home was not defendant's property, but was only a copy. Selke testified that he had never told anyone that the microfiche was stolen. Selke testified that there were twenty-nine contacts with the prosecutor's office between November 15, 1978, and January 22, 1979, and additional contacts after January 22, 1979.

Mr. Bruce Leitman, plaintiff's attorney for the criminal charges, was allowed to testify. Leitman is an adjunct professor of law at Wayne State University Law School. Leitman testified that while he worked as an assistant for the Oakland County Prosecutor's Office he made literally hundreds of determinations as to whether warrants should be issued. Leitman further testified that the prosecutor's office continues to call him occasionally to ask his opinion about whether certain warrants should be recommended.

Leitman was allowed to give an opinion that plaintiff's arrest was unusual for a number of reasons. First, if something was in fact stolen from defendant, the property seized in plaintiff's home was not the same property. Also unusual was the rank of prosecutors involved for such a "minor"

and "unprovable" case, i.e., Chief Prosecutor Richard Thompson and Prosecutor L. Brooks Patterson, and the prosecutor's involvement with the media. A local newspaper clipping entered into evidence quoted Patterson as stating on January 24, 1979:

> It would behoove him [plaintiff] to cooperate. If he wants to stonewall us, he can stonewall all the way to Jackson.

Leitman further testified that a nonsufficient-funds charge, filed against plaintiff seven days after his initial arrest, was brought without a citizen's complaint. He found this unusual because "one thing I learned in the prosecutor's office and I'm certain that it is the same throughout all of eternity is that the prosecutor's office is not a collection agency."

Leitman further testified that, without question, defendant was putting pressure on the prosecutor's office. The bases for his opinion were the unusualness of the arrest, the absence of a police report, that such a complaint would never get to the Chief of Warrants and that the Oakland County Prosecutor's Office would not normally do the investigation. Further, statements were made by the Oakland County Prosecutor's Office's investigator to Leitman and plaintiff "about what Michigan Bell wants, and how he can extricate himself from the criminal position [and that it] all boiled down to Michigan Bell was the moving party." Leitman was allowed to further testify concerning other unusual circumstances surrounding plaintiff's arrest.

Plaintiff testified that he worked in the collections business and that he became a skip tracer. Although he had known that white knights ex-

isted, he first saw them in the trash in a Lincoln Park shopping center where defendant has an office. He got them from the trash and from vendors until 1977. One time he went to the loading dock at the rear of defendant's office on Second Avenue and asked for the books and was told that he could take them. On one occasion, he accompanied a vendor to an office on Schoolcraft and Telegraph where the books were loaded into his car by the man at the shipping and receiving dock.

Plaintiff sold white knights to different agencies. When the books were no longer being put out, plaintiff received a call from a Mr. Bell who offered to sell him microfiche. Plaintiff purchased microfiche from Mr. Bell. The microfiche he purchased were copies of defendant's directory reprints, which did not have the white stripes on them. Plaintiff had copies made by Gerald Kollar at Madison Reproductions and then sold them. Plaintiff gave sets to Grinnells and Master Charge in exchange for information. Defendant called plaintiff in 1975. At that time, defendant knew that plaintiff was "peddling the books." Plaintiff saw the publicity on January 19, 1979, but did not get rid of any of his microfiche.

Immediately following his arrest on January 22, 1979, the officers advised plaintiff that they would drop the charges if he would name his source. He was taken to jail where he slept on the floor with forty people in one cell. His request for an attorney was ignored and the next morning he was questioned in the prosecutor's office.

Approximately one week after his arraignment and release on bond, he was arrested again on a nonsufficient-funds charge. However, this time the warrant was unsigned and he spent another night in jail.

Between the two arrests, plaintiff received calls

from the prosecutor's office asking for "the truth."
He was also called by York with the same question. York said, "We'll have to pursue this," and
told plaintiff that if plaintiff named his source
they would drop the charges. Following the arrest
and the attendant publicity, plaintiff was unable to
obtain work, he lost his self-respect, and he did not
earn enough in 1980 or 1981 to file an income tax
return.

The Oakland County Prosecutor's Chief of Warrants Division denied that there was any pressure
placed on him to issue a warrant, and an investigator from the Oakland County Prosecutor's Office
testified that it was not unusual to arrest at the
time of search. On cross-examination, the Oakland
County Prosecutor's Office's investigator admitted
that a search of the Security Bank revealed that
the bank had the same kind of microfiche that was
found in plaintiff's home but that no arrests were
made nor was the bank prosecuted.

Defendant raises several issues, which we address seriatim.

I

Defendant contends that the trial court failed to
manage the admission of evidence and jury instructions with the "great caution" mandated in
malicious prosecution claims. The defendant relies
on *Renda v International Union, UAW,* 366 Mich
58, 74; 114 NW2d 343 (1962). Defendant contends
that the rules set forth in the *Renda* case place
stringent evidentiary limitations on the trial court
and argues that the trial court was therefore
required in the instant case to exclude much of the
evidence that was admitted. However, defendant
cites no cases, and this Court has found none,
which suggest that malicious prosecution suits

require a different standard for the admission of evidence.

The bulk of the *Renda* opinion is concerned with jury instructions. However, concerning the one evidentiary question which *Renda* addressed, the Court stated at page 103:

> In malicious prosecution not only is plaintiff given a wide range tending to establish malice; but, likewise, the defendant is given the same full opportunity to disprove it. [Citations omitted.]

Contrary to defendant's position, the "wide range" would indicate broader rules for inclusion, albeit only for the element of malice.

A review of the record discloses that the trial court, over the entire course of this six-week trial, transcribed on close to 2,500 pages, exhibited a meticulous care in the many evidentiary rulings which had to be made. Throughout the trial, the jury was given careful and precise instructions on such matters as the admission of evidence for limited purposes and rebuttal testimony. We find that the trial court managed the admission of evidence with great caution.

II

Defendant next contends that the trial court abused its discretion by permitting Bruce Leitman, plaintiff's attorney in the underlying criminal action, to testify as an expert witness.

It is within a trial court's discretion to admit or exclude expert testimony, and an exercise of that discretion will not be reversed except where it is clearly abused. *Johnson v Detroit,* 79 Mich App 295, 299; 261 NW2d 295 (1977), citing *Coger v Mackinaw Products Co,* 48 Mich App 113; 210 NW2d 124 (1973).

Defendant cites *Jacobs v Weissinger,* 211 Mich 47, 49; 178 NW 65 (1920), for the proposition that the practice of allowing an attorney who *has* represented a party to testify as a witness for the party has long been condemned. Defendant overstates the law. In *Jacobs,* the Court stated at page 49:

> It is, we think, to be regretted that an *attorney of record* in the case should find it necessary to support the contention he is bound to make with his own testimony. It is a practice not to be commended, and, while such testimony is competent, its consideration by the court is always a matter of embarrassment, because it is difficult to distinguish between the zeal of the advocate and the fairness and impartiality of a disinterested witness. The practice has received judicial attention in many cases and has found scant approval. [Citations omitted.]

The instant case is distinguishable from *Jacobs,* because Leitman was not an attorney of record in this case. More importantly, *Jacobs* has been cited by the Supreme Court in four subsequent cases, none of which were reversed because the attorney of record testified. See *In re Lewandowski's Estate,* 236 Mich 136; 210 NW 314 (1926), *Penczak v Penczak,* 238 Mich 97; 213 NW 117 (1927), *In re Mette's Estate,* 260 Mich 225; 244 NW 456 (1932), and *Shapiro v Wendell Packing Co,* 366 Mich 289; 115 NW2d 87 (1962). Similarly, this Court has recognized "a traditional dislike for the practice of an attorney taking the stand" and found no error when the plaintiff's attorney was so precluded. *Selph v Evanoff,* 28 Mich App 201, 205; 184 NW2d 282 (1970). On the other hand, in *Osborn v League Life Ins Co,* 20 Mich App 19, 21; 173 NW2d 724 (1969), this Court stated that "an attorney at law

representing a party may testify on his behalf." Under some facts, this Court has found that "[t]he testimony of plaintiff's attorney was necessary to prove plaintiff's claims." *Schaible v Michigan Mutual Ins Co,* 116 Mich App 116, 124; 321 NW2d 860 (1982), lv den 417 Mich 920 (1983).

Finally, plaintiff correctly argues that Leitman presented testimony that was unavailable from other witnesses, including a description of plaintiff when he first was referred to Leitman, the reaction of the prosecutor when the nonsufficient-funds charge was dismissed, and Leitman's rebuttal testimony when an Oakland County criminal investigator denied telling Leitman that defendant was behind the nonsufficient-funds charge. We find no error.

Defendant next contends that Leitman invaded the province of the jury by testifying to the lack of probable cause to prosecute plaintiff.

Defendant correctly states the rule of *People v Lyons,* 93 Mich App 35, 45-46; 285 NW2d 788 (1979):

> The general rule is that courts will not permit even expert witness testimony on a question of domestic law because it is the exclusive responsibility of the trial judge to find and interpret the applicable law. [Citations omitted.]

The *Lyons* Court found that the admission of an expert's opinion concerning whether an interest-bearing account would qualify as a security under the Uniform Securities Act was error requiring reversal. However, when the expert's opinion states the law consistent with the applicable statute and the trial court's jury instructions, the error is harmless. *People v Matulonis,* 115 Mich App 263, 268; 320 NW2d 238 (1982).

Before Leitman testified, out of the presence of the jury, the trial court carefully ruled on each of Leitman's areas of testimony and stated that Leitman could not testify as to the elements of receiving and concealing stolen property or to probable cause. Defendant argues that he did so testify. Leitman testified that "it is my opinion of the law that one of the elements . . . of the crime . . . is that the property he was found with must have been exactly the same property that was stolen." He repeated that testimony and then stated: "In my opinion, it is plain on its face after doing any reasonable ten minute investigation, that Mr. Meehan did not commit the crime, was not even chargeable with the crime of receiving and concealing stolen property." He repeated his opinion that the property had to be "stolen in fact" and the "same property," and then stated that, under the same circumstances, he would not authorize a warrant.

To the extent that Leitman erroneously testified as to the elements of receiving and concealing stolen property, the error was harmless because the law stated was consistent with MCL 750.535; MSA 28.803, and with case law interpreting the statute. See, e.g., *People v Harris*, 82 Mich App 135, 137; 266 NW2d 477 (1978). It was also consistent with the trial court's instruction. *Matulonis, supra*. We note, however, that both *Lyons* and *Matulonis* address invasion of the province of the trial judge. Invasion of the province of the jury, the issue raised by defendant here, was addressed in *People v Drossart*, 99 Mich App 66, 80-82; 297 NW2d 863 (1980), lv den 410 Mich 892 (1981):

> However, where the expert's particular training and experience in a special field of activity—such as the study of mental diseases—is largely unfa-

miliar to the jury, his opinion can be submitted for the jury's consideration.

\* \* \*

Accordingly, the trial court did not err in permitting the expert witnesses to testify that in their opinion the defendant was or was not "mentally ill" or "insane" at the time of the alleged offense. The objection that such testimony is an improper legal conclusion, invading the provinces of the judge and jury, is without merit. [Citations omitted.]

In *People v McClinton Robinson,* 417 Mich 231, 234; 331 NW2d 226 (1983), rev'g 107 Mich App 417; 309 NW2d 624 (1981), our Supreme Court reversed this Court's holding that "an expert may not opine on the degree of negligence in a medical malpractice case where a jury is as capable as anyone else of reaching such a conclusion on certain facts." *Robinson,* 107 Mich App 422.

To the extent that Leitman testified as to probable cause, his testimony went to whether the prosecutor had probable cause to authorize a warrant, which plaintiff does not have to prove in a malicious prosecution action. Leitman did not testify concerning whether defendant had probable cause to instigate the arrest, an element which a plaintiff must prove in a malicious prosecution action. But even if Leitman did testify as to whether defendant had probable cause to instigate plaintiff's arrest, it is not error requiring reversal because the jury can reject his opinion testimony, *Drossart, supra,* or defendant may bring in a rebuttal expert. Further, as the Supreme Court noted in *Robinson, supra* at 233:

The trial court erred in excluding this testimony. MRE 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissi-

ble is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Defendant's argument that the jury did not need Leitman's testimony misconstrues MRE 702; the rule presents a broader standard, i.e., whether the opinion testimony "will assist the trier of fact." *Strach v St John Hospital Corp,* 160 Mich App 251, 272; 408 NW2d 441 (1987), lv den 429 Mich 886 (1987). There was no error.

We agree with the trial court's conclusion that Leitman's specialized knowledge would assist the trier of fact in understanding procedures of the prosecutor's office such as a "squeeze," or that nonsufficient-funds charges were not normally prosecuted, and whether a warrant would normally issue in a case similar to this. Leitman's testimony meets the standard in MRE 702. The trial court indicated that defendant could bring in its own expert. Although the prosecutor's office was not the defendant in the instant case, defendant could be expected to call individuals from the prosecutor's office who would testify that plaintiff's prosecution was normal. We find no abuse of discretion.

Defendant cites *Kaminski v Grand Trunk W R Co,* 347 Mich 417; 79 NW2d 899 (1956), and *Buckeye Union Fire Ins Co v Detroit Edison Co,* 38 Mich App 325; 196 NW2d 316 (1972), for the proposition that when two conjectures or inferences are equally plausible, the jury cannot base a finding on either one. Defendant then argues that Leitman's opinion testimony as to the unusual nature of plaintiff's prosecution should have been excluded because it was equally plausible that the unusual treatment was due to either public interest or pressure from defendant. In *Kaminski,* the Court quoted from the "classic" definition of what

is conjectural and what is not in negligence cases. However, the *Kaminski* rule is applicable in a situation where a directed verdict is sought. *Schedlbauer v Chris-Craft Corp*, 381 Mich 217, 220; 160 NW2d 889 (1968). Defendant has cited no authority, and this Court has found none, to indicate that the rule applies to the admissibility of opinion testimony by expert witnesses. This Court has stated:

> A party may not leave it to this Court to search for authority to sustain or reject its position. *Butler v Detroit Automobile Inter-Ins Exchange*, 121 Mich App 727, 737; 329 NW2d 781 (1982). [*Thomas v McPherson Community Health Center*, 155 Mich App 700, 710; 400 NW2d 629 (1986).]

Defendant argues, without supporting citation to authority, that there was no foundation in fact for Leitman's opinion testimony that plaintiff's prosecution was unusual, presumably arguing thereby that that testimony should have been excluded. This issue is without merit.

In *Gainey v Sieloff (On Remand)*, 163 Mich App 538, 545; 415 NW2d 268 (1987), this Court cited MRE 705 and stated that an expert may testify in terms of opinion, and a trial court may require the prior disclosure of the underlying facts or data for such an opinion. Hence, the trial court has discretion to require the underlying facts or data for an opinion to be put into evidence.

In any case, there was ample factual support for Leitman's opinion testimony that plaintiff's prosecution was unusual. Chief Assistant Prosecuting Attorney Richard Thompson testified that in "white-collar crimes" the normal procedure is to get a warrant before the arrest; in plaintiff's case, the arrest warrant was obtained the day after he

was arrested in his home. Warrants Division Chief Michael Izzo's testimony regarding the normal procedure with the nonsufficient-funds charge, i.e., that the procedure can take up to one year, was in marked contrast to plaintiff's nonsufficient-funds arrest which occurred within a matter of days after the prosecutor's first contact with the payee on the check. Assistant Prosecutor Eugene Friedman testified that the property seized would have to be the exact property stolen in order for him to recommend a warrant on receiving and concealing stolen property. In plaintiff's case, there was testimony that not only was the property which was seized in plaintiff's home not the original property of defendant, but that Selke knew that it was not. Likewise, there was ample testimony in the record to justify Leitman's opinion testimony that defendant exerted pressure on the prosecutor's office to prosecute plaintiff.

Defendant contends that Leitman was not qualified to testify as to the practice and procedures of the prosecutor's office as they existed at the time of plaintiff's prosecution.

Whether witnesses are sufficiently qualified to render opinions rests within the sound discretion of the trial court and that court's decision will only be reversed for an abuse of discretion. *People v Beckley,* 161 Mich App 120, 124-125; 409 NW2d 759 (1987), lv gtd 430 Mich 858 (1988), citing *People v Barr,* 156 Mich App 450, 456; 402 NW2d 489 (1986).

Leitman testified that he was licensed to practice law in Michigan in 1967 following graduation from the University of Michigan Law School. At the University of Michigan, he was a research clerk to Professor Yale Kamisar, one of the two or three most noted criminal scholars in the United States. He worked for the Oakland County Prose-

cutor's Office from June, 1967, until February, 1969, at a time when "the thirteen of us did all of the jobs." He determined whether warrants should issue and under which charge, tried cases, and did preliminary examinations. He made "literally hundreds" of determinations concerning whether to issue warrants. He is Adjunct Professor of Law at Wayne State University Law School and has served as Special Assistant Prosecutor on behalf of Oakland County both in this Court and at the trial court level. He was a founding member of the Criminal Jurisprudence Committee of the State Bar of Michigan, and founding member of the Standard Jury Instructions Committee. He has served as Special Assistant Attorney General for the Dominion of Canada to handle extradition. He has practiced civil and criminal law since 1969; and since 1979 has practiced extensively in the criminal area. Because some of his closest friends and colleagues are still with the Oakland County Prosecutor's Office, he has had constant and close contact with that office. He is often called by the prosecutors and asked to give his opinion as to whether warrants should issue.

We believe Leitman was eminently qualified to testify as an expert.

Defendant's argument that Leitman's testimony was more prejudicial than probative is without merit. The fact that Leitman's testimony contradicted defendant's theory is not "prejudice" within the meaning of MRE 403.

III

Plaintiff next contends that evidence of publicity about and pleadings from a Washtenaw Circuit Court action brought by Perry M. Kantner against Michigan Bell for negligent treatment of microfiche was inadmissible because it was irrelevant.

Evidence adduced at trial indicated that defendant knew about plaintiff's activities concerning the white knights in mid-1978, and possibly as early as 1975, but chose to do nothing. Shortly after defendant was served with the *Kantner* complaint seeking $12,000,000 plaintiff was arrested.

The admission of publicity regarding the *Kantner* lawsuit was relevant at the very least to the element of malice. A jury could find that defendant orchestrated plaintiff's arrest in order to get out from under the $12,000,000 lawsuit for negligence and that defendant's primary purpose was not to bring plaintiff to justice.

Further, even if only the lawsuit, and not the attendant publicity, was relevant to plaintiff's first arrest, the publicity is relevant to plaintiff's second arrest. Perhaps, most importantly, a jury could infer that plaintiff's first arrest was *in anticipation of* negative publicity about the *Kantner* suit. Such publicity was certain to materialize, given that a $12,000,000 class action had been filed against defendant.

Defendant argues that pleadings in the *Kantner* lawsuit, in which defendant denied that it had a legal duty to prevent loss or theft of the names and addresses of the nonpublished customers, are not admissions and, further, are irrelevant and unfairly prejudicial. Defendant relies on *Hall v Detroit Marine Terminals, Inc,* 409 Mich 888 (1980), a case of "doubtful precedential authority." *Larion v Detroit,* 149 Mich App 402, 409; 386 NW2d 199 (1986), lv den 426 Mich 861 (1986). *Hall,* however, addressed inconsistent claims elaborated in answers to interrogatories within the same action against two separate defendants and is thus distinguishable from the instant case. *Robertson v United Fuel & Supply Co,* 218 Mich 271; 187 NW

300 (1922), also cited by defendant, similarly addresses the issue of inconsistent claims within the same action against two defendants and is distinguishable from the instant case. Defendant in the instant case is not making a claim or defense which is inconsistent with the defense in the *Kantner* lawsuit. To the contrary, defendant is totally consistent in stating that "Michigan Bell had no legal obligation to prevent dissemination of names and addresses of subscribers having unlisted [telephone] numbers." The applicable rule was stated by this Court: "[A] pleading . . . may be treated as admissible in evidence in a different proceeding, as an exception to the hearsay rule's normal exclusion of extra-judicial statements." *Larion, supra* at 406.

Defendant's statement of the rule of *Slocum v Ford Motor Co,* 111 Mich App 127; 314 NW2d 546 (1981), lv den 414 Mich 886 (1982), is imprecise. According to defendant, *Slocum* stands for the rule that statements made in third party complaints cannot be used as admissions against the pleader in the first party action. *Slocum* involves inconsistent claims and is distinguishable from the instant case. *Slocum* is further distinguishable because it involved allegations made by the defendant in its third-party indemnification complaint against a tire manufacturer.

The evidence of the pleadings in the *Kantner* lawsuit permits an inference that defendant was not careful in handling the names and addresses of the customers with nonpublished phone numbers, which in turn can prove defendant's malice. Any unfair prejudice caused by the admission of that evidence is offset by the fact that the evidence also tends to prove *defendant's* theory, i.e., that even though it had no duty concerning the names and addresses of customers with nonpublished

phone numbers, it "bent over backward" to protect that information.

Finally, we find this claim of error waived because defendant signed a stipulation agreeing that certain evidence of the *Kantner* lawsuit would be read to the jury. It appears that defendant desired the admission of this evidence because it tended to support defendant's theory.

IV

Defendant raises other evidentiary issues, which we address briefly.

Defendant next contends that evidence of allegedly widespread distribution of copies of paper and microfiche directories to debt-collection agencies and credit departments was irrelevant and, therefore, inadmissible. MRE 401. We disagree.

Evidence of the widespread distribution of copies of Michigan Bell paper directories and of microfiche directories diminished the likelihood that anyone possessing microfiche would possess stolen originals. The evidence permitted an inference that defendant knew of the distribution, knew that the distribution consisted of copies, was embarrassed by the negative publicity, and used plaintiff as a scapegoat. This evidence thus goes to the element of malice and the lack of probable cause to believe that a crime had been committed.

Defendant further contends that evidence of plaintiff's arrest on a nonsufficient-funds charge was unduly prejudicial. However, a review of the record reveals evidence that defendant was involved in the nonsufficient-funds charge. At least there was sufficient evidence for the jury to reach such a conclusion. Further, this evidence was relevant to the abuse of process claim.

We find no merit in defendant's other claims of evidentiary error by the trial court.

V

Defendant next argues that the trial court erred in denying defendant's motion for judgment notwithstanding the verdict or for a new trial.

An appellate court reviews a trial court's denial of a defendant's motion for judgment notwithstanding the verdict by viewing the evidence and all legitimate inferences which may be drawn therefrom in a light most favorable to plaintiff. This Court must then determine whether the evidence was sufficient to establish a prima facie case. *Matras v Amoco Oil Co,* 424 Mich 675, 681-682; 385 NW2d 586 (1986). If the evidence presented could have led reasonable jurors to reach differing conclusions, the motion is properly denied. *Bonelli v Volkswagen of America, Inc,* 166 Mich App 483, 495-496; 421 NW2d 213 (1988).

On the other hand, a trial court may grant a motion for new trial when the verdict is against the overwhelming weight of the evidence. Granting such a motion is within the sound discretion of the trial court, which must not substitute its judgment for that of the jury. *Green v Evans,* 156 Mich App 145, 155; 401 NW2d 250 (1985). Because a motion for a new tral requires a lesser showing by the movant than a judgment notwithstanding the verdict, we analyze the evidence here only under the former standard.

Defendant first argues that there was insufficient admissible evidence to support the jury finding that defendant lacked probable cause to believe plaintiff was guilty of a crime. This Court in *Koski v Vohs,* 137 Mich App 491, 514; 358 NW2d 620 (1984), quoted *Thomas v Winters,* 258 Mich

429, 432; 242 NW 780 (1932), wherein the Court defined probable cause:

> "To constitute probable cause, there must be such reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the person arrested is guilty of the offense charged."

The Supreme Court in *Koski v Vohs,* 426 Mich 424, 432; 395 NW2d 226 (1986), was even more succinct. Citing Prosser & Keeton, Torts (5th ed), § 119, p 882, the Court stated that the question of probable cause was a determination which "involves only the conduct of a reasonable man under the circumstances." The Court also reiterated the rule that "in a malicious prosecution action, absent a dispute of fact, the question of probable cause is a question of law to be determined by the court." 426 Mich 427. Citing *Clanan v Nushzno,* 261 Mich 423, 427; 246 NW 168 (1933), the Court stated the corollary to the above rule, that "[w]hen the facts are in dispute, the question is for the jury with instructions as to what constitutes probable cause." 426 Mich 431. In a footnote, the Court added that "in Michigan, discharge of the plaintiff at the preliminary examination is not, of itself, evidence of want of probable cause." 426 Mich 432, n 5.

In the instant case, there was evidence from which a jury could find that defendant lacked probable cause for initiating or continuing the proceeding. Selke testified that he accompanied investigators Walsh and A'Hearn to plaintiff's home in order to identify property found there as defendant's property. Selke acted in his "capacity as an investigator for Michigan Bell Telephone Company." He testified that the microfiche found

in plaintiff's home was not defendant's property and he knew that on January 22, 1979. Defendant knew that its security regarding disposal of the microfiche was weak. A representative of defendant testified that, prior to 1981, the contracts with vendors for disposal of the microfiche did not contain language regarding confidentiality.

Walsh testified that in November, 1978, when Glen Lasuita was arrested, Lasuita reported that he found masters in the garbage and had reproductions made. Selke was present at that time and heard Lasuita's story. Walsh was present at Madison Reproductions on January 3, 1979, and could have told Selke that plaintiff picked up copies of microfiche on January 2, 1979. Selke testified that on January 4, 1979, Walsh told him that no warrant was possible at that time. Neither was a warrant possible on January 17, because there were no new developments.

A jury could reasonably infer that defendant was embarrassed by its lack of security regarding the disposal of the microfiche, that defendant knew that Lasuita was getting masters from the garbage, that as late as January 17, 1979, two days before the first publicity, defendant knew that a warrant was not possible because there was no proof of anything stolen, and most importantly, that even at the time of plaintiff's arrest on January 22, 1979, and at the issuing of the warrant on January 23, 1979, there was no proof of anything stolen. Defendant's arguments as to the reasonableness of its belief that plaintiff had its stolen property were rejected by the jury.

Defendant argues that there was no dispute of material fact and the question of probable cause was for the court. As indicated, *supra,* there was contradictory testimony whether Selke said that the microfiche in plaintiff's home was stolen. The

testimony regarding what Lasuita said and did was contradictory. Defendant states that "plaintiff purchased microfiche bearing that legend from 'Mr. Bell' who he believed worked for Michigan Bell." The evidence does not support that statement. Plaintiff did not know who "Mr. Bell" worked for.

In general, the testimony of defendant's witnesses was elusive at best, evasive, and occasionally an obvious lie. There was no direct evidence that anything was stolen from defendant. Throughout the trial, Selke insisted that he never told anyone that the microfiche was stolen. There was evidence that paper and microfiche white knights were picked out of defendant's trash, or possibly supplied by vendors who were under no contractual obligation of confidentiality. The question of probable cause properly went to the jury.

*Koski* is distinguishable because there the defendant discovered that the plaintiff, even though he had a claim of right, was endorsing checks made out to the police officers association, cashing them, and then converting the funds to his own use. The Court stated that "no interpretation of these facts would permit plaintiff to use the self-help method of collecting the civil debt which he believed was owed to him by the association." 426 Mich 438. In the instant case, up to and including the day of plaintiff's arrest, the strongest case defendant had against plaintiff was that he was copying and selling defendant's discarded property.

At trial, defendant's counsel stated that "it's Michigan Bell's contention that what's at stake is information, not a potential theft of film, microfiche, film strip, itself, which may be worth pennies." In its brief on appeal, defendant states "there is no question that the plaintiff was in possession of the information (nonpublished tele-

phone numbers) contained on the microfiche and that information was in fact stolen from Michigan Bell." The evidence does not support that statement. Walsh initially testified that Lasuita got nonpublished telephone numbers from plaintiff. The next day he admitted that that was not true; it was addresses that Lasuita got from plaintiff. Further, plaintiff was not prosecuted for having information. As plaintiff notes, "theft of information may be violative of copyright sanctions or some other law, but it is not sufficient to impose criminal liability for receiving and concealing stolen property." The jury's finding that defendant lacked probable cause to believe plaintiff had stolen property is not against the overwhelming weight of the evidence. *Green, supra.*

Defendant next argues that there was insufficient admissible evidence to permit the jury's finding that defendant instigated or continued the prosecution against plaintiff and that "the only thing that Michigan Bell did in this case was to go to the Southfield police and tell them it had been informed that someone was apparently selling copies of its microfiche containing nonpublished information."

The evidence does not support that statement. Selke testified that he doubted there were twenty-nine contacts between defendant and the prosecutor's office, but that he did not want to count them. There was testimony that defendant had supplied the information to the prosecutor's office regarding Madison Reproductions. There was evidence that York called plaintiff after the first arrest in order to "squeeze" him for information. York announced on the radio that his staff was working hand-in-hand with the prosecutor's office. Leitman rebutted Walsh's denial that he ever said "it's not us, it's Bell." The jury's finding that

defendant instigated and continued the prosecution against plaintiff was not against the overwhelming weight of the evidence.

Defendant argues that there was evidence that the prosecutor conducted an independent investigation and exercised independent discretion. Izzo's and Thompson's testimony concerning the normal procedures in the prosecutor's office support defendant's argument. However, the person from the prosecutor's office who was most involved with plaintiff's prosecution, John Walsh, gave testimony which was so lacking in credibility as to undermine the credibility of the entire prosecutor's office. The jury did not believe him.

Defendant next argues that the admissible evidence was insufficient to permit the jury's finding that defendant acted with malice. Where there is lack of probable cause, malice may be inferred. *Friedman v Dozorc,* 412 Mich 1, 55; 312 NW2d 585 (1981); *Renda, supra* at 100. Even if that inference was impermissible, however, there was evidence that defendant had "a primary purpose other than that of bringing the offender to justice." *Wilson v Yono,* 65 Mich App 441, 443; 237 NW2d 494 (1975). There was evidence that defendant had knowledge of plaintiff's activities as early as 1970 through 1975. A jury could infer that if defendant waited to instigate proceedings against plaintiff until January, 1979, defendant had a primary purpose other than that of bringing the offender to justice. York testified that defendant's "basic motivation from the beginning" was to ascertain if an employee was involved. From the negative publicity which appeared on January 19, 1979, and from the service on defendant of the $12,000,000 class action at 12:15 P.M. on January 22, 1979, a jury could reasonably infer that defendant's primary

purpose was to counter both with an immediate arrest, a scapegoat. There was no error.

VI

Defendant next contends that the trial court erred in instructing the jury on malicious prosecution. Defendant requested the following instructions:

> If you find that plaintiff has proved each of the elements that I have explained to you and *the defendant has failed to prove there was not either an independent investigation by the prosecutor's office or the exercise of discretion by the prosecutor's office,* your verdict will be for the plaintiff.
> If you find that the plaintiff has failed to prove any of the elements or if you find that *the defendant has proved the defense of either an independent investigation by the prosecutor's office or the exercise of discretion by the prosecutor's office,* your verdict will be for the defendant.

Instead, the Court charged:

> Now if you find that plaintiff has proved each of the elements that I have explained to you and the defendant has failed to prove that it made a *full and fair disclosure to the prosecutor and that it did nothing to interfere with the prosecutor's independent exercise of discretion,* your verdict will be for the plaintiff on this claim.
> If you find that the plaintiff has failed to prove any one of the elements, or if you find that the defendant has provided [sic] . . . that *it made a full and fair disclosure to the prosecutor, and that it did nothing to interfere with the prosecutor's independent exercise of discretion, your verdict will be for the defendant.*

The trial court's instructions were correct. In

the instant case, because defendant did not request the full and fair disclosure instruction, the requested instructions are only "partly good." In *Renda, supra* at 78, the Court cited *Westchester Fire Ins Co v Earle,* 33 Mich 143 (1876), and stated the rule well established in this state that where a party asks an instruction which is partly good and partly bad, it is proper to refuse it altogether.

There was evidence that defendant did not fully and fairly disclose to the prosecutor its disposal procedures or the audits critical of those procedures. There was testimony that Selke told Walsh at plaintiff's home that the property seized was stolen and that he knew that it was not stolen. Therefore, the trial court's instructions were appropriate as to full and fair disclosure. There was also evidence that defendant interfered with the prosecutor's independent investigation and with the exercise of the prosecutorial discretion. Therefore, the trial court's instructions were appropriate as to noninterference with the prosecutor.

For the same reasons, defendant's argument that it was deprived of the defense that the prosecutor conducted an independent investigation is without merit.

Defendant also argues that the instructions impermissibly shifted the burden of proof to defendant. The applicable standard jury instruction states in pertinent part:

> If you find that plaintiff has proved each of the elements that I have explained to you, and the defendant has failed to prove the defense of _____, your verdict will be for the plaintiff.
> If you find that the plaintiff has failed to prove any one of the elements, or if you find that the defendant has proved the defense of _____, your verdict will be for the defendant. [SJI2d 117.02.]

Clearly, it is defendant's burden to prove his defenses. There is immunity only if there is full and fair disclosure. Defendant did not argue full and fair disclosure nor do the proofs support it. Reversal is not required.

VII

Defendant further contends that the evidence failed to establish a prima facie case for abuse of process.

In *Spear v Pendill,* 164 Mich 620, 623; 130 NW 343 (1911), the Court stated:

> "This action for the abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." 32 Cyc p 541.

* * *

> "Two elements are necessary to an action for the malicious abuse of legal process: *First,* the existence of an ulterior purpose, and, *second,* an act in the use of the process not proper in the regular prosecution of the proceeding. Regular and legitimate use of process, though with a bad intention, is not a malicious abuse of process." 1 Cooley on Torts (3d ed), pp 355, 356.

This Court interpreted *Spear* in *Three Lakes Ass'n v Whiting,* 75 Mich App 564, 571; 255 NW2d 686 (1977). In *Three Lakes, id.* at 571, this Court quoted the language from 3 Restatement Torts, § 682, Comment a, p 464, which the Supreme Court adopted in *Moore v Michigan National Bank,* 368 Mich 71, 75; 117 NW2d 105 (1962):

> The gravamen of the misconduct for which the liability stated in this section is imposed is not the wrongful procurement of legal process or the

wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish. Therefore, it is immaterial that the process was properly issued, that it was obtained in the course of proceedings which were brought with probable cause and for a proper purpose or even that the proceedings terminated in favor of the person instituting or initiating them. The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed under the rule stated in this section.

This Court found in *Three Lakes* that, because the defendant filed a separate suit for alleged tortious conduct regarding defendant's condominium project and then subsequently offered to dismiss the action if the plaintiffs would end not only that conduct but all opposition to the project, there was abuse of process. Similarly, in *Friedman, supra,* the Court found that, even though the plaintiff alleged an ulterior purpose, allegations regarding the mere filing of an inadequately investigated malpractice claim did not state a claim for abuse of process.

Defendant argues that there was no evidence to support a finding of an abuse of process, i.e., the subsequent misuse of process after it has issued. Based on the trial testimony, a reasonable jury could find that York called plaintiff and both offered to drop the existing charges if plaintiff would talk and also threatened plaintiff with further prosecution for not talking. In addition, the jury could find that defendant did another act, that of causing the second arrest for a nonsufficient-funds charge. Hence, there was evidence to support finding an abuse of process.

VIII

Defendant next contends that the trial court erred in instructing the jury on abuse of process.

In *McClaine v Alger,* 150 Mich App 306, 317; 388 NW2d 349 (1986), lv den 425 Mich 882 (1986), this Court stated:

> Failure of a court to give accurate, applicable and properly requested standard jury instructions does not result in automatic reversal on appeal; a jury verdict should be so vacated only when the failure to do so would be inconsistent with substantial justice. MCR 2.516, 2.613; *Johnson v Corbet,* 423 Mich 304; 377 NW2d 713 (1985).

In the instant case, the trial court gave the following instructions on the abuse of process:

> The plaintiff in this case is also claiming an abuse of process. The elements of abuse of process are the following:
>
> First, an ulterior purpose.
>
> Second, an act by the defendant in the abuse [sic] of process which is improper in the regular prosecution of the proceeding.
>
> Third, plaintiff has the burden of proving each of the following:
>
> First, that the plaintiff was injured or suffered damages. Second, an ulterior purpose in causing process to issue. Third, an act in the abuse [sic] of process which is improper in the regular prosecution of the proceeding. Fourth, that the conduct of the defendant was a proximate cause of the injuries or damages to the plaintiff.
>
> If you find that plaintiff has proved each of the elements I have explained to you, your verdict will be for the plaintiff.

The jury began deliberations at 3:22 P.M. on March 13, 1985. At 3:35 P.M., the jury was brought

back and the trial court repeated the instructions, but with the correct word "use" of process rather than "abuse" of process. The jury returned to deliberate at 3:45 P.M. At approximately 9:00 A.M. on March 14, 1985, the jury requested and received a copy of the instructions which the trial court had read. At 3:25 P.M. the jury returned its verdict.

Defendant correctly states that there are no standard jury instructions for abuse of process. However, the trial court used the language of the Supreme Court in *Spear, supra* at 623, and more recently in *Friedman, supra* at 30. We find the instruction to be adequate.

IX

The defendant next contends that the verdict form submitted to the jury was improper.

The verdict form submitted to the jury consisted of four questions. The first three referred to the counts of abuse of process, malicious prosecution, and intentional infliction of emotional distress, respectively. The fourth question asked for the total amount of damages.

In *People v United States Currency,* 158 Mich App 126, 130; 404 NW2d 634 (1986), this Court stated:

> [A] statement of position without supporting authority is insufficient to preserve a claim for appeal because it is not up to this Court to discover and then to rationalize the basis of a party's claims. [Citations omitted.]

In the instant case, defendant cites no authority to support its position that the verdict form was improper. We therefore decline to address it.

x

Defendant raises several issues concerning the judgment in this case.

Defendant first argues that trebling the verdict was impermissible under MCL 600.2907; MSA 27A.2907.

The recent Supreme Court case of *Camaj v S S Kresge Co,* 426 Mich 281; 393 NW2d 875 (1986), considerably narrows the scope of MCL 600.2907; MSA 27A.2907 (the trebling statute). In *Camaj,* the Court stated at page 290:

> We, therefore, hold that § 2907 is intended only to reach those actions in which a party brings suit against a person who had instituted proceedings against the current plaintiff in the name of another, without the named person's consent, or where there is no such person known.

However, application of *Camaj* is limited to those cases where a final judgement had not entered by October 7, 1986.

Since the final decision in the instant case was rendered June 30, 1986, the holding in *Camaj* is inapplicable. We find no error.

Defendant next contends that prejudgment interest should have been awarded only on the jury verdict of $195,000, not on the trebled judgment. We do not agree.

In *Stewart v Isbell,* 155 Mich App 65, 80; 399 NW2d 440 (1986), this Court defined a money judgment as follows:

> For purposes of the interest statute, a money judgment is defined as one which adjudges the payment of a sum of money, as distinguished from an order directing an act to be done or property to be restored or transferred. [Citations omitted.]

The Legislature made it clear in its 1980 amendment of the interest statute that the legislative intent was to deter dilatory tactics by civil defendants who, at six percent simple interest, had no incentive whatsoever to promptly settle claims against them. *Gage v Ford Motor Co,* 423 Mich 250, 257; 377 NW2d 709 (1985).

This Court in *LaLone v Rashid,* 34 Mich App 193, 204; 191 NW2d 98 (1971), lv den 386 Mich 756 (1971), referred to "the judgment of $90,000 in treble the amount of the general verdict returned by the jury." In *Markowicz v Pappas,* 102 Mich App 1, 9; 300 NW2d 713 (1980), lv den 411 Mich 992 (1981), this Court reduced an award for malicious prosecution by $4,500 plus interest, which amount represented "the excessive portion of the verdict times three, as the damages for malicious prosecution were trebled." In *Bass v Spitz,* 522 F Supp 1343, 1354-1355 (ED Mich, 1981), the court construed the prejudgment interest statute and stated that

> [t]he statute was amended precisely to prevent erosion in the value of a judgment, and to discourage a defendant from delaying litigation. These purposes are best served by allowing interest on the full trebled amount of plaintiff's recovery.

We find no merit to defendant's argument.

Defendant also argues that it was denied a fair trial by the cumulative effect of the alleged errors. Since this Court has failed to find any error requiring reversal or any number of minor errors, defendant's argument is without merit.

Defendant lastly argues that the jury's verdict was clearly excessive.

In *Harvey v Security Services, Inc,* 148 Mich App 260, 270; 384 NW2d 414 (1986), lv den 425 Mich 863 (1986), this Court stated:

A reviewing court will substitute its judgment for that of the jury only where the verdict has been secured by improper methods, prejudice or sympathy, or where it is so excessive as to "shock the judicial conscience." Where a verdict is within the range of evidence produced at trial, this Court will not reverse it as excessive. [Citations omitted.]

This Court has reviewed the transcript and finds that the verdict was not secured by improper methods, prejudice or sympathy and is not excessive. It certainly does not shock the judicial conscience.

Affirmed.

MACKENZIE, P.J., concurred in the result only.